GEORGIA RAILROAD AND BANKING COMPANY *v.* WRIGHT, comptroller-general, *et al.*

1. The present constitution imperatively requires that all property of every nature whatsoever within the territorial limits of the State shall be taxed, except such as the constitution expressly authorizes the General Assembly to exempt from taxation.

2. The constitution does not require any property to be taxed more than once.

3. A tax law will not be so construed as to require the same property to be taxed a second time, unless such a construction is required by the express terms of the statute or by necessary implication.

4. When a tax is imposed upon that which has inherent value in the hands of one person, and is also imposed upon that which is a mere symbol thereof in the hands of another person, deriving its value solely from that which it represents, the same property is twice taxed.

5. When a tax is levied against a corporation upon all its property, and a tax is also levied upon the value of the shares in the hands of the stockholders, that which makes up the value of the property of the corporation and the value of the shares of the stockholders is one and the same thing, and under such a system of taxation the same property is twice taxed.

6. By the act of 1885 (Acts 1884-5, p. 30) shares of stock in corporations within this State were declared to be the subject of taxation.

7. By the act of 1886 (Acts 1886, p. 24) the act of 1885 above referred to was repealed, so far as it related to stock in corporations in this State where were required by law to make a return of property for taxation to the comptroller-general.

8. By the act of 1888 (Acts 1888, p. 29) the act of 1885, so far as it related to the taxation of shares of stock of corporations within this State, was repealed as to shares of stock in those corporations where the law required the president of the company to return the property of the corporation for taxation.

9. The provisions in the tax acts of 1886 and 1888, which in effect declare that shares of stock in domestic corporations need not be returned for the purpose of taxation, have been carried forward in every tax act which has been passed up to the present time, and were not repealed by the adoption of the Code of 1895. There is no law now of force in this State, nor has there been since 1888, requiring shares of stock in corporations within the State to be returned for taxation when the president or other officer of the company is required by law to return the property of the corporation, either to the comptroller-general or the tax-receiver of the county.

10. The General Assembly not being required by the constitution to impose a tax on shares of stock in domestic corporations where the property of such corporations is taxed in the hands of the company, the failure of the General Assembly to impose such a tax, while imposing a tax upon shares in foreign corporations, is not, as to the owners of shares of the latter class, a violation of those provisions of the constitution of Georgia which require that protection to property shall be impartial and complete, and that all taxation shall be uniform upon the same class of subjects and ad valorem on all property subject to be taxed within the territorial limits of the taxing authority, nor of that provision of the fourteenth amendment to the constitution of the United States which declares that no State shall deny to any person within its jurisdiction the equal protection of the laws.

11. "A tax in another State is no tax for the purposes of the State of Georgia."

12. That provision in the constitution of the State which declares that protection to person and property shall be impartial and complete is the

equivalent of a declaration that no person shall be denied the equal protection of the laws.

13. The first section of the fourteenth amendment to the constitution of the United States places a limitation upon all the powers of a State, including, among others, that of taxation.

14. The limitations in the fourteenth amendment are upon the State and those who act in its name and under its authority, and have no reference to actions by individuals.

15. The courts of this State will take judicial notice that the mass of property in the State is made up of lands and the different forms of personalty, but such notice can not be taken as to the quantity of personalty.

16. When in a given case it appears that only two persons are proceeded against by the tax officers of the State for taxes on a particular character of personalty, the courts can not take judicial notice that there are other persons in the State who are also owners of property of that character, and who have not been required to pay taxes thereon.

17. Custom among taxpayers to return their property for taxation at sums less than that required by law will not, as to a taxpayer called upon to pay the full amount of his tax, amount to a denial of the equal protection of the laws, when the custom was adopted without the authority or consent of the tax officers of the State, and over the protest of such officers.

18. The administration of valid tax laws of a State will not be declared to amount to a denial of the equal protection of the laws, unless it appear that the officers charged by the law of the State with the collection of taxes knowingly, wilfully, and intentionally so administered the law as to place upon one person or class a burden from which another person or class similarly situated is relieved.

19. The trial judge, to whom the case was submitted on both the law and the facts, having found that the evidence did not disclose any discrimination in the assessment and levy of the taxes on the stock in controversy, as compared with other property in the State, and that the value placed on the stock by the comptroller-general is not excessive, and having also found generally in favor of the defendant on all of the issues of fact in the case, and there being evidence to authorize each finding, and the trial judge having, upon a motion for a new trial, declined to disturb the findings made by him at the final hearing, the judgment will not be reversed on the ground that the findings were contrary to the evidence and without evidence to support them.

20. The different acts of the General Assembly relating to the method of collecting the taxes upon the property of railroad companies for State, county, and municipal purposes are to be construed together, and when so construed they are exhaustive as to the method to be adopted in the collection of taxes of every character imposed by law upon all the property of railroads. When so interpreted, there is nothing in such acts to violate that provision of the constitution of the State which declares that all taxes "shall be levied and collected under general laws."

21. Tax executions, whenever lawfully issued, bear interest at the rate of

seven per cent. per annum upon the amount of taxes embraced therein "from the time fixed by law for issuing the same." A tax execution may be lawfully issued whenever the time fixed by law for the payment of the tax has expired; and whenever issued, it bears interest from the first day that it could have been issued.

22. When a taxpayer causes an injunction to be issued, restraining the collection of taxes against him, interest upon the tax execution is not suspended while the injunction is operative, if the taxpayer is by the final decree declared liable for the taxes.

23. When a taxpayer is enjoined from returning given property for taxation and from paying taxes on the same, and the tax officer is also enjoined from levying and collecting any taxes upon such property, at the instance of a third party, the taxpayer is not relieved from the payment of interest on the tax execution subsequently issued, when it appears that the taxpayer was a mere complacent defendant, interposing no obstacle to the injunction, in no way seeking to obtain permission of the court to pay any amount as admitted to be due as taxes, and, so far as the record discloses, acquiescing in the contention of the plaintiff that no tax is due thereon.

24. When a taxpayer is enjoined from making a return of his property or a portion thereof for taxation, and the injunction is subsequently dissolved, he should be allowed the same time for making a return after the dissolution of the injunction as he would have been allowed under the law if no injunction had been granted, and the tax officer should not proceed against such a taxpayer as a defaulter until such time has elapsed.

25. When the injunction issued by the United States circuit court, restraining the plaintiff from returning for taxation the stock involved in the present case, was issued, the plaintiff, under the law, had twelve days remaining of the time in which to make a return for taxation for that year. The comptroller-general not having made an assessment of the property until after the expiration of that time, the assessment was valid, and it was not error to refuse to enjoin the execution issued on such assessment.

26. The injunction referred to in the preceding note having been operative from April 19, 1902, to January 10, 1905, the plaintiff should have been allowed such time for making returns, after the dissolution of the injunction, as the law allowed it during the years 1903 and 1904, that is from January 1 to May 1, four months. The assessments for these years having been made within less than this time, they were unauthorized and illegal, and the executions for these years should have been enjoined from proceeding.

27. The four months which the taxpayer should have been allowed, to make a return of the stock for taxation for the years 1903 and 1904, having now expired, and no return of such stock having been made, the executions issued by the comptroller-general should be returned to his office, by him cancelled, and a new assessment for these years made and new executions issued.

28. Even if there was any error in refusing to strike the prayer in the

amendment to the answer, on the ground that it was vague and indefinite, the error was not of such a character as to require a reversal of the judgment.

29. All the questions in the present case not dealt with in the preceding notes are concluded by the former decision in this case. The judgment is affirmed, with direction that the decree be so amended as to enjoin the executions issued for the taxes of the years 1903 and 1904 from proceeding further; in all other respects the decree to stand as rendered.

Argued April 18,—Decided May 24, 1906.

Equitable petition. Before Judge Pendleton. Fulton superior court. February 2, 1906.

*Joseph B. & Bryan Cumming, Sanders McDaniel, Joseph R. Lamar,* and *Alexander C. King,* for plaintiff.

*John C. Hart, attorney-general, Boykin Wright,* and *Smith, Berner, Smith & Hastings,* for defendant.

COBB, P. J. This case makes its second appearance. See *Georgia R. Co.* v. *Wright,* 124 *Ga.* 596. When before this court on a former occasion, numerous questions were involved and were decided. Many of the questions which were then determined appear again in this record. Counsel candidly concede that the questions of law which were determined when the case was here before are no longer open. But it is contended that there are some questions raised in the present record which were not concluded by the former decision. As to those matters where the parties are concluded by the former decision, we will say nothing. We will deal only with such questions as seem to us not to have been involved or decided when the judgment refusing an interlocutory injunction was under consideration.

1-9. The constitution of this State imperatively requires that all property of every nature whatsoever within the territorial limits of this State shall be subjected to taxation, except that which the constitution in terms declares the General Assembly may in their discretion exempt from taxation. *Atlanta National Building & Loan Asso.* v. *Stewart,* 109 *Ga.* 80(2). A single tax upon any species of property will satisfy the demands of the constitution. A tax law will not be construed to tax the same property twice, unless such a conclusion is constrained either by the express provisions of the law or by necessary implication. Gray on Lim. Tax. Power, §1366. Many, if not all, laws imposing taxes upon property contain provisions which in effect tax some species of property

38

more than once.   There are in the tax laws of this State instances where the thing which gives value is twice taxed.   Wherever there is the imposition of a tax upon one who holds the tangible article of inherent value, as well as upon another who holds merely the symbol which derives its value solely from the tangible article, the same property is twice taxed.   The property of a corporation is that which gives value to its shares.   If a tax is levied upon the property in the hands of the corporation, and a tax is levied upon the value of the shares in the hands of the shareholders, that which gives value to the holdings of the corporation and to the shares of the shareholder is unquestionably subjected to a double burden. While shares of stock are property in the hands of the shareholder, they have no inherent value, and derive their sole value from the tangible or other property which is owned by the corporation.   The taxation of both the property of a corporation in the hands of the corporation, and the value of the shares in the hands of the shareholders, is manifestly an instance where the same property is twice taxed.   It is double taxation in a sense, but not that species of double taxation which would be void.   It is permissible, but not compulsory.   Gray on Lim. Tax. Power, §1372 et seq.; Commonwealth *v.* Fall Brook Co., 156 Pa. St. 488 (26 Atl. 107); Commonwealth *v.* Lehigh Co., 162 Pa. St. 603 (29 Atl. 664).

The act of 1885 (Acts 1884-5, p. 30) declared that personal property for the purposes of taxation shall be construed to include "all stocks and securities, whether in corporations within the State or in other States, owned by citizens of this State, unless exempt by the laws of the United States or of this State."   It is settled by the former decision in this case that this act, so far as it relates to the taxation of shares of foreign stock held by citizens of this State, is still of force.   It is therefore unnecessary to determine whether shares of foreign stock held by a citizen of this State are a species of property which the constitution imperatively requires to be taxed.   Let it be conceded that the constitution does not imperatively require its taxation, and that the General Assembly has a discretion to determine whether it should be subjected to taxation.   The General Assembly exercised this discretion by the passage of the act of 1885, which in this respect stands to this day unrepealed.   If the General Assembly has a discretion in reference to double taxation where the State of Georgia receives the benefit

of both taxes, certainly it must have a discretion in regard to this matter where, on account of the character of the property, the taxing authorities of this State can not impose more than one tax. It may be that double taxation results so far as those interested in the property are concerned, the property of the corporation being taxed in one jurisdiction and shares of stock in another jurisdiction. But this necessarily results in every instance where that which gives value is in one jurisdiction, and the owner of that which is a mere symbol of value is within another jurisdiction, and the right to tax is exercised in both jurisdictions. Under such circumstances the escape from double taxation is either a change of residence or a change of investment. It would be more than idle to contend in this day that one who owns shares of stock in a corporation is not an owner of property. It is true that the value of the property depends largely, if not entirely, upon a fiction of the law. But every holder of a share of stock in any corporation is a property owner. Shares of stock are bought and sold. They are bequeathed to legatees and descend to heirs. They have all the qualities of every other character of property, except that they have no inherent value. The value of the shares depends upon the value of the property of the corporation which issues them. Their situs for taxation is within limits subject to legislative declaration. The legislature may have even the right under our constitution to declare that the situs for taxation of shares of foreign stock held by a resident of Georgia is not in Georgia, but they clearly have the power to declare that shares of such stock have a situs for taxation in this State. The General Assembly has so declared, and residents in this State who own this class of property must bear the same burden of taxation as is required of owners of other kinds of property. It is said, though, that even if all this be conceded, the act of 1885 declares that shares of stock in a domestic corporation shall be also taxed, and that the failure of the tax officers to collect a tax upon shares of domestic stock is a denial to owners of foreign stock of an equal protection of the laws, and therefore it is contrary to the provisions of the fourteenth amendment to the constitution of the United States to require the owners of foreign stock to pay taxes upon their shares. The second section of the act of 1885 undoubtedly declares that shares of stock in domestic corporations should be subjected to taxation in the same manner

as shares of stock in a foreign corporation. There can be no escape from this conclusion. The words of the section are unambiguous, and it is impossible to place any other construction upon its language. In the first section of the act of 1885, which contains a number of questions to be propounded to the taxpayer when he makes his returns, appears the following: "The amount of capital invested in stocks of companies, other than such companies as are required to be returned by the president, or their agents, either to the tax-receiver or the comptroller-general?" The title of this act is, "An act to provide for the correct returns of the property in this State for the purpose of taxation, and for other purposes." It is manifest from the title that the questions propounded to taxpayers are intended to disclose to the tax officer property which is to be subjected to taxation; and hence the propounding of the question is a legislative declaration that the property which will be disclosed in a correct answer to the question is property which must be taxed. If the question calls for the disclosure of property which has an intrinsic value and is located within this State, then of course the property must be taxed, for the constitution imperatively requires that this shall be done. If, however, there is no question which compels the taxpayer to disclose the ownership of that which has no situs for taxation within this State, or which has no taxable value, when there is no legislative declaration to that effect, then the absence of the question indicates a legislative intent not to declare taxable that which has no intrinsic value, but which becomes taxable merely as a result of a law declaring it to have a taxable value. The question above quoted excepts from the answer all stocks in companies where the law requires the president or other agent to return the capital invested in such company to the tax-receiver or the comptroller-general. There was no law at that time, nor is there any law at this time, requiring the capital invested in stocks of foreign corporations to be returned by the president or other officer to the tax-receiver or comptroller-general. The question propounded in the first section is, therefore, entirely consistent with the provisions in the second section, that stocks in corporations in other States shall be returned by the shareholders for taxation. At that time the law required railroad companies to make return of their capital to the comptroller-general, and required other corporations within this

State to make a return of their capital to the tax-receiver of the county in which the corporation was located. There is no question in the act intended to compel a disclosure by the taxpayer of shares of stock in any domestic corporation. Hence there is a conflict between the first and second sections of the act, and the provisions of the second section must prevail, as being the last expression of the General Assembly on that subject. *Lamar* v. *Allen,* 108 *Ga.* 164. The General Assembly may, in the exercise of a sound discretion, say that when that which gives value to the domestic stock has borne its just proportion of the public burden, the owner of such shares shall not be required to pay taxes a second time upon that which has been already taxed. Has the General Assembly said this subsequently to the act of 1885?

In 1886 the first section of the act of 1885 was amended, and in lieu of the question above quoted, the following question was propounded: "The amount of capital invested in stocks of companies other than such companies as are required to be returned by the presidents or their agents to the comptroller-general?" (Acts 1886, p. 27.) There was no express repeal of the second section of the act of 1885, and therefore the provisions of that section have remained in force, so far as they were in conflict with the provisions of the act of 1886. The question under the act of 1886 required the taxpayer to disclose his ownership of stocks in all corporations, foreign and domestic, where the law did not require the president or other agent of the corporation to make a return to the comptroller-general. The effect of this act was to relieve from taxation shares of stock in any domestic corporation where the law required the president or agent of such corporation to make a return to the comptroller-general, but left a tax still imposed upon shares of stock in any domestic corporation where the president or agent was not required to make a return to the comptroller-general. The question in the act of 1886 is inconsistent with the provision in the second section of the act of 1885, so far as that provision relates to shares of stock in domestic corporations where the capital of the corporation is returned by the president, or other agent, to the comptroller-general; and to this extent the act of 1885 was repealed by the act of 1886. In 1888 the general tax act (Acts 1888, p. 29) required that the comptroller-general, in addition to the questions required by law to be propounded to the

taxpayer, should frame such questions as would reach all property upon which a tax was imposed by that act, and especially certain classes which are set forth in that act. One of these requires the taxpayer to disclose the value of stocks owned in foreign corporations, as well as in domestic corporations, where the capital stock is not returned by the president of the corporation. This was a legislative declaration to the taxpayer that he need not disclose to the tax officer the value of stock he may have owned in a foreign corporation or in a domestic corporation, where, under existing laws, the capital of such corporation was returned by the president. By section 7 of that act the presidents of all manufacturing and other incorporated companies (or their agents) except railroad, insurance, telegraph, telephone, express, sleeping and palace car companies, were required to return all the property of their respective companies, at its true market value, to the tax-receiver of the county where the company is located, in order that it might be taxed as other property in this State is taxed. The law then required that the companies excepted from the operation of section 7 of this act should return their property, either through their president or their agent, to the comptroller-general. The effect of the act of 1886 was to relieve shares of stock in domestic corporations from taxation when the shares were in companies of the excepted class above referred to. The effect of the act of 1888 was to relieve shares of domestic stock from taxation in all other companies, provided the president or agent of such company was required by law to return the property of the corporation to the tax-receiver of the county. After the passage of the act of 1888, no share of stock in a domestic corporation was taxable in the hands of a shareholder; for every domestic corporation was required by law to return its property either to the comptroller-general or the tax-receiver of the county. The general tax acts of 1890, 1892, 1894, and 1896 contain the same provisions as appeared in the tax act of 1888, in practically the same language, and in some instances the identical language, used in that act. (Acts 1890-1, vol. 1, pp. 41, 45; Acts 1892, pp. 28, 33; Acts 1894, pp. 24, 28; Acts 1896, pp. 28, 32.)

We have treated the terms, "capital" and "capital stock," used in these provisions of the tax acts which relate to the return for taxation of the corporation by its president, as meaning the same thing as all the property of the corporation. If there is any doubt

as to whether this is the proper meaning to be placed upon these words, that doubt is entirely relieved by the general tax act of 1898 (Acts 1898, p. 36). The questions to be propounded to the taxpayer are set forth in that act, which are declared to be in addition to those already required under existing laws. The 33d question is in the following language: "How many shares of stock did you own, on the date fixed for the return of property for taxation, issued by corporations within this State, the capital stock of which, or the property of which, is not returned by such corporation for taxation?" No taxpayer, under this act, was required to disclose to the tax officer the stock owned by him in any corporation within this State when either the capital stock of the company or the property was required by law to be returned by the corporation for taxation. The eighth section of that act provides for the return by the president of all incorporated companies, except where the law requires a return to the comptroller-general, of all the property of the corporation to the tax-receiver of the county at its true value. Section 833 of the Political Code is a codification of the first section of the act of 1885, as amended by the act of 1886. The codifiers failed to carry into the code the act of 1888, but there is nothing in that code which is inconsistent with its provisions on the subject of the taxation of shares of domestic stock. The general tax act of 1896 contained provisions similar to the tax acts of previous years. The general tax act of 1898 places the matter beyond all question. (Acts 1898, pp. 29, 36.) The general tax act of 1900 preserves the questions required under the existing law, and contains the same provisions as to the return of the property of the corporation to the tax-receiver of the county by the president in all those cases where the law does not require the return to be made to the comptroller-general. (Acts 1900, pp. 29, 36.) This is also true of the general tax acts of 1902, 1904, and 1905. (Acts 1902, pp. 28, 35; Acts 1904, pp. 36, 44; Acts 1905, pp. 37, 43.)

It will appear from what has been said, that from the date of the act of 1885, to wit October 20, 1885, to the date of the act of 1886, to wit December 27, 1886, shares of stock in domestic corporations were required by law to be returned for taxation in this State. From the date of the act of 1886 to the date of the act of 1888, to wit December 6, 1888, shares of stock in domestic corporations were required to be returned for taxation only in those com-

panies where the law did not require the president to make a return of the capital or property of the corporation to the comptroller-general. This was certainly the law until the adoption of the Code of 1895. The adoption of the code made no change in this law, for the section of the Political Code above cited is merely a codification of the acts of 1885 and 1886; and though the act of 1888 is not embraced in the code, there is no irreconcilable conflict between the provisions of the act of 1888 and that section of the Political Code. The adoption of the code did not change the law. The existing law was merely declared and emphasized by the tax act of 1896. The tax act of 1898 and subsequent tax acts place the matter beyond all doubt. Shares of stock in domestic corporations are not taxable under the existing laws of the State, and have never been taxable under any law of the State except during the brief period above referred to.

10, 11. The constitution declares, "All taxation shall be uniform upon the same class of subjects, and ad valorem on all property subject to be taxed within the territorial limits of the authority levying the tax." Civil Code, § 5883. If a tax law provide that that which is property on account of its inherent and intrinsic value shall not be subject to taxation, the law is in violation of the provision of the constitution just quoted. The General Assembly has no authority to omit from the operation of any tax law anything which is of inherent and intrinsic value as property. If, however, something which is not inherently or intrinsically valuable can be declared by the law to have, in the hands of a possessor, a taxable value, the failure of the lawmaking power to exercise its power and declare it is so taxable would not prevent a law, imposing a tax on all that which is taxable on account of its inherent value, from being a uniform law within the meaning of the constitution. If the General Assembly, in the exercise of the authority vested in it, declares that which is held with no intrinsic value to possess a taxable value, and all persons who have holdings of that character are taxed alike, the law is still uniform, within the meaning of the constitution. A share of stock in a corporation has no inherent or intrinsic value. The General Assembly may declare that for the purposes of taxation it shall have that value which the owner may derive from it in the markets of the world. The General Assembly can not make it a subject of taxation at an arbitrary

value; but if it is a thing which can be bought and sold upon the market, it is within the authority of the lawmaking power to declare that for the purposes of taxation it shall be treated in the hands of the owner as of the value which it would command in the market. When that which gives it value has been taxed, the General Assembly is not required, under the constitution, to tax it again through the medium of the shareholder. But it may do so; and when the tax levied is uniform on all shareholders of the same class, the constitutional provision as to uniformity is complied with. A shareholder in a domestic corporation whose property is taxed in the hands of the corporation by the State is not in the same class with the shareholder in a foreign corporation whose property is not taxed and can not be taxed by the taxing authority of the State. Therefore a tax law levying a tax upon the market value of shares in foreign corporations held by citizens of this State, and not levying such a tax upon shares of stock in a corporation in this State where the corporation has paid the full amount of tax upon its property, does not violate the rule of uniformity in our own constitution; nor does it violate that provision in the State constitution which says that protection to property shall be impartial and complete; nor does it violate that provision in the fourteenth amendment to the constitution of the United States which declares that no State shall deny to any person within its jurisdiction the equal protection of the laws. Kidd v. Alabama, 188 U. S. 730; Wright v. Railroad Co., 195 U. S. 219; Missouri v. Dockery, 191 U. S. 165.

12-19. When the constitution of this State declares that protection to person and property shall be impartial and complete, it but states in other language the same principle laid down in the constitution of the United States when that instrument declares that no State shall deny to any person the equal protection of the laws. If the compulsory payment of taxes due by the plaintiff is a violation of the constitution of the United States, it is equally a violation of the constitution of this State. As was held in the case when it was here before, there is ample provision in the laws of this State for proceeding against one who was a tax defaulter in the years that are past. As we have interpreted our laws, they afford ample machinery, consistent with constitutional provisions, for reaching every species of property that is subject to taxation at any

time in the past that the taxing power is authorized to proceed for the collection of back taxes. There is no fault in the law. The constitution declares what shall be taxed under all circumstances. The General Assembly has seen proper to bring within the range of taxation some of those things which the constitution does not imperatively require shall be so brought. For every tax which has been lawfully levied by the General Assembly, or which the constitution requires to be levied, the means for the collection is at hand. With such a construction placed upon our laws, there of course can be no merit in the contention that there is in the law itself a denial of the equal protection of the laws.

But it is said that although the laws may be valid they are not impartially administered. At this time no attack can be made on the tax laws of this State. The plaintiff is concluded by the former decision, and counsel very properly do not invoke from this court a decision on a matter which has already been the subject of an adjudication in this case. It is contended, however, that the evidence in the present record is not in all respects the same as that contained in the former record, and that the evidence now before us-shows that the law has not been administered impartially. The plaintiff claims to have proved that the tax officers of the State have applied equal and valid laws unequally, in that, first, the plaintiff and the Central of Georgia Railway Company are the only holders of shares of foreign stock in the State who are required to pay tax upon such stock; second, that their foreign stock is taxed at a valuation grossly in excess of the valuation of other property; third, that other property is habitually assessed at only two thirds of its value, while the foreign stock of plaintiff and the Central of Georgia Railway Company is assessed at more than one hundred per cent. of its value; and fourth, that shares of foreign stock and shares of domestic stock are taxable by virtue of the same laws, but the comptroller-general and other tax officers have failed to enforce the statutes against the holders of shares of domestic stock.

A State law which upon its face so discriminates against a person or a class as to amount to a denial of the equal protection of the laws is undoubtedly obnoxious to the provision of the first section of the fourteenth amendment to the constitution of the United States. But this provision of that amendment can be violated in other ways than by the passage of a State law. It has

been held a number of times by the Supreme Court of the United States that a denial of the equal protection of the laws, within the meaning of this amendment, may arise out of the administration of a law which is perfectly fair upon its face. It has been held that the amendment is not only a limitation upon the legislative power of the State, but also upon the executive and even the judicial authority of the State. "Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by a public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution." Yick Wo v. Hopkins, 118 U. S. 373 and cit.; 1 Current Law, 580; 3 Ibid. 755. "A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are executed, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a State government, deprives another of property, life, or liberty without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional prohibition; and as he acts in the name and for the State, and is clothed with the State's authority, his act is that of the State. This must be, or the constitutional prohibition has no meaning." Neal v. Delaware, 103 U. S. 397; and cit. See also Virginia v. Rives, 100 U. S. 313; Strauder v. West Va., 100 U. S. 303; Ex parte Virginia, 100 U. S. 339; Chicago R. Co. v. Chicago, 166 U. S. 226; Brannen's Fourteenth Amendment, 97; 3 Current Law, 755. It has been held that "The first section of the fourteenth amendment places a limit upon all the powers of the State, including, among others, that of taxation." County of Santa Clara v. So. Pac. Ry., 18 Fed. 385, 397. The opinion in the case just cited was delivered by Mr. Justice Field on the circuit. See also Judson on Taxation, §310, et seq.; San Francisco Nat. Bank v. Dodge, 197 U. S. 70. However, when it is contended that the law of a State is so administered that it denies to a person or class the equal protection of the laws,—not that it is unconstitutional on its face, but because the manner of its administration is such that it is enforced exclusively against certain

classes, the fact of discrimination is matter of proof, and no lati-
tude of intention will be indulged; and it is not sufficient simply
to allege such exclusive enforcement, but it must also appear that the
conditions to which the law was directed do not exist exclusively
amongst that class, and that there are other offenders against whom
the law is not enforced.    Ah Sin *v.* Wittman, 198 U. S. 500.    As
was said by Mr. Justice McKenna, in the case just cited, "No lati-
tude of intention should be indulged in a case like this.    There
should be certainty to every intent."

Having reached the conclusion that there was nothing in the law
of this State requiring the collection of a tax upon shares of do-
mestic stock during the years involved in the present litigation, of
course the failure of the tax officers to collect tax on this character
of stock can not be said to be a denial of the equal protection of
the laws to any taxpayer.    Whether there has been such a denial
in other particulars depends upon the proof.    The judge, to whom
this case was submitted both upon the law and the facts, has ren-
dered a decree in which he makes the following findings:    1. The
evidence submitted does not disclose any discrimination in the
assessment and levy of the tax on the stock in controversy, com-
pared with other property in the State.    2. The evidence sub-
mitted does not show that the value of the stock placed thereon by
the comptroller-general is excessive.    In addition to this there is
in the decree a general finding in favor of the defendants on all of
the issues, both of law and of fact.    The finding of the judge on
the facts of the case carries with it all the sanctity of a verdict of a
jury.    Upon a motion for a new trial he has refused to disturb his
findings of fact.    The case therefore stands in the same position
before this court as if there had been a general verdict by a jury
for the defendant, and a motion for a new trial had been overruled
by the presiding judge.    Under such circumstances this court in-
variably applies the rule that the judgment will not be reversed if
there is any evidence to authorize the findings of fact.    The plain-
tiff in error can not prevail here by simply showing that the pre-
ponderance of evidence was in its favor.    The burden is upon it to
show that the finding is entirely unwarranted by the evidence.    It
would not be profitable to discuss the evidence in detail, or to at-
tempt to reconcile the conflicts which appear therein.    If there is
any holder of shares of foreign stock in this State who is liable for

tax thereon who has not been proceeded against by the tax officers of this State, the record does not disclose the fact. It is said that the court should take judicial cognizance that there are individuals residing in this State who are owners of this class of property. It would be extending the doctrine of judicial notice very far to hold that the courts judicially know the character of the property owned by the individual citizens within the limits of their jurisdiction. The courts judicially know that the mass of property is made up of certain classes and species, such as lands, live stock, household goods, merchandise, debts, credits, stocks, bonds, etc., but they do not judicially know how much is owned by all the citizens, nor do they judicially know in any instance who is the owner of any class of property, or whether there are other owners of such property than those disclosed by the evidence in a particular case.

As to those years in which the plaintiff had an opportunity to return its property for taxation and failed to do so, and for which the property has been assessed by the comptroller-general, whether the property has been excessively assessed can not now be inquired into. Under the former ruling in this case it is concluded by the failure to return the property at the time required by law, and must bear the burden of the assessment made in conformity to law. There was neither averment nor proof that the assessment was the result of fraud or corruption on the part of the comptroller-general. If there had been, a different question would have been presented.

It was contended that there is a uniform custom prevailing in this State for taxpayers to return their property at less than its value. If there is such a custom, it did not have its origin with the tax officers of this State; and there was evidence from which the judge could find, even if it did not constrain him to find, that taxpayers conforming to such a custom did so without the consent or authority, and over the protest, of the tax officers of the State. The law of this State requires that each taxpayer shall return his property for taxation at its true market value. The record discloses that the attorney-general of the State has so advised the comptroller-general, and that the comptroller-general has so instructed the subordinate tax officers of the State. It certainly can not be held that a denial of the equal protection of the laws results to this plaintiff from a custom of taxpayers in contravention of law, which has arisen over the protest and against the instructions

of the tax officers of the State.   It would be a startling proposition
to say that no person should be required to pay his taxes, because
some citizens are shrewd enough or unscrupulous enough to suc-
ceed in having their returns received by the tax officer when the
valuations are lower than the law requires, and lower than the oath
which each taxpayer makes to his return requires.   There may be
persons within the limits of the State, probably many, who have
avoided the burdens of taxation, either by not returning their
property for taxes or by returning it at a value lower than its true
market value.   But the evidence in this case authorizes, if it does
not require, a finding that the tax officers of this State were not
parties to such a practice.   The administration of the tax laws of a
State will not be declared to be in violation of the fourteenth
amendment to the constitution of the United States, unless it ap-
pears that the officers charged by the law of the State with the
collection of taxes knowingly, wilfully, and intentionally administer
the law so as to place upon one person or class a burden from which
another person or class similarly situated is relieved.   The record
does not disclose that such a case has been made out against the tax
officers of the State of Georgia.   Mistakes may have been made in
the reception of the returns of some taxpayers.   Mistakes may have
been made in the assessment of property in given instances.   But
there is nothing in the record to authorize the conclusion that the
comptroller-general or the subordinate tax officers have in any in-
stance wilfully, knowingly, or intentionally administered the law
so that it would be harsh, burdensome, or oppressive as to one, and
relieve another similarly situated from like burdens.   As said by
the Supreme Court of the United States, this is a matter of proof.
"No latitude of intention should be indulged in a case like this.
There should be certainty to every intent."   Even if the proof does
not show a perfect and exact administration of the law, it fails to
show such an administration as would bring down upon the heads
of the officers the condemnation of the supreme law of the land,
which denounces an administration "with an evil eye and an un-
equal hand."   We do not think that the evidence makes such a
case as would authorize us to hold that there has been a denial of
the equal protection of the laws to the plaintiff, and that therefore
its property should not be subjected to the tax sought to be im-
posed upon it.   Coulter *v.* Louisville R. Co., 196 U. S. 599; Florida

R. Co. v. Reynolds, 183 U. S. 471; Winona Land Co. v. Minnesota, 159 U. S. 526.

20. The act of 1874 (Acts 1874, p. 107, Pol. Code, §780 et seq.) prescribed a method to be followed in the assessment and collection of taxes upon the property of railroad companies. The presidents of all railroad companies were required to make a return to the comptroller-general, showing "the value of the property of their respective companies, without deducting their indebtedness; each class or species of property to be separately named and valued, so far as the same may be practicable, to be taxed as other property of the people of the State." In *Sav., Fla. & Western Ry.* v. *Morton, 71 Ga.* 25 (2), it was held that the act of 1874 was exhaustive as to the method of collecting State taxes on railroad property, and that the property which was used by the company for railroad purposes should be returned to the comptroller-general, as well as that which was not so used, and the entire State taxes upon every character of property owned by the company should be levied by the comptroller-general. In the cases of *City of Albany* v. *S., F. & W. Ry., 71 Ga.* 158, and *County of Houston* v. *Central Railroad, 72 Ga.* 211, there was an intimation that property owned by railroad companies, not used for railroad purposes, should be taxed in the county where the property was situated, under the general law applicable to individuals; but there was no ruling in either case to this effect. See also *City of Atlanta* v. *Ga. Pac. Ry., 74 Ga.* 16; *Ordinary of Bibb Co.* v. *Central R. Co., 40 Ga.* 646. In 1883 an act was passed which provided that all property owned by any railroad corporation of this State, not used by such corporation in its usual and ordinary business, should be taxable by the counties and municipal corporations in which the property was situated, and that such property should be returned for taxation to the proper officers of the county and municipality in which the property was located, the taxes to be collected by execution in the same manner that taxes were to be collected from individuals in the county or municipality. (Acts 1882-3, p. 41.) In 1889 the General Assembly passed an act providing for the taxation of the property of railroads by counties. (Pol. Code, §784 et seq.) This act divided the property of railroad companies into located and unlocated property. The located property was to be taxed in the county of its location. The unlocated property was to be valued as a whole, and

each county through which the road ran was given a proportion of the taxes on such unlocated property. In 1889 that portion of the act of 1874 requiring returns by the presidents of railroad companies to the comptroller-general was amended by adding, after the words "railroad companies," the following words, "including street railroads, dummy railroads, and electric railroads." See Pol. Code, § 780. In 1890 the General Assembly passed an act declaring that all the property, both real and personal, belonging to railroad companies in this State, within the taxable limits of any municipality, was subject to taxation by such municipality. The method of collecting the taxes was that to be followed in the act providing for the county taxation of railroads, the presidents of such companies being required to add to their returns such additional facts as were necessary to carry out the scheme of taxation by municipalities. Acts 1890, p. 152; Pol. Code, § 725 et seq.; See, in this connection, *Columbus So. Ry. Co.* v. *Wright,* 89 *Ga.* 574; *Sparks* v. *Macon,* 98 *Ga.* 301; *City of Atlanta* v. *Wright,* 119 *Ga.* 207. The act of 1874 provided a method of collecting State taxes on railroad property, the act of 1889 a method of collecting county taxes on such property, and the act of 1890 a method of collecting municipal taxes on the property of such companies. When these acts are considered together, it is manifest that it was the intention of the General Assembly that they should be exhaustive of the method of assessing and collecting all taxes required to be paid by railroad companies on property owned by them. We are strengthened in this view of the matter by the fact that the codifiers of the Code of 1895 have omitted from the code the provisions of the act of 1883 requiring railroad companies to return property not used for railroad purposes to the proper officer of the county and municipality where such property is located. It was properly omitted, for it conflicted with the scheme provided by the three acts above referred to. Under this scheme, located property is to be taxed in the county or municipality where located, without reference to whether it is used for railroad purposes or whether it be real property or personal property. The unlocated property is to be distributed to the different counties or municipalities according to the plan provided in the acts. All property of every nature whatsoever is to be embraced in the return to the comptroller-general. He is to see that the amount of taxes due the

State is collected, and also the amount of taxes due each county and municipality on property located within the limits of the same, as well as the proportion of taxes due each on the unlocated property. If a railroad company owns real property or personal property within the limits of a county or municipality, which is not used for railroad purposes, it is still subject to the same tax as like property owned by individuals. The tax goes to the county or municipality. In case of individuals the return for taxation would be made to the tax receiver of the county. In case of such property owned by a railroad company the return is made to the comptroller-general. We see nothing in this provision of the law which conflicts with the requirement of the constitution that taxes must be collected under general laws. It has been held that the provision in the act of 1889 and the act of 1891, providing that the located property of railroad companies used for railroad purposes should be returned to the comptroller-general, instead of the tax-receiver, was not in conflict with the provision of the constitution above referred to. See *Columbus So. Ry. Co.* v. *Wright,* and *Sparks* v. *Macon,* supra. We can see no reason why a different rule should be applied to located property not used for railroad purposes. The railroad company is required to pay no higher rate of taxation than any other property owner. It is required to pay its taxes on the same day on which every other property owner is required to pay; and so far as the substance of the matter is concerned, it stands upon exactly the same footing as an individual. We think it within the power of the General Assembly to provide that a railroad company should make a single tax return of all property owned by it, such return to be used as the basis for all the taxes levied by the State and its political subdivisions. In the acts above referred to, the General Assembly has done this, and, under this scheme, the rights of the county and municipality are fully protected in regard to the amount of tax due each, and the rights of the railroad company are also fully protected as to the amount of the taxes required of it. If the shares of stock in the foreign corporation upon which it sought to collect a tax in this case had been owned by an individual residing in Richmond county, he would have been required to return the same for taxes to the tax-receiver at their true market value, and also to the proper officer of the City of Augusta. That is, the location of the property would be in the county and city

where the owner resided. Being owned by the plaintiff, a corporation whose principal office is in the City of Augusta, it is taxable in the county and municipality where the company resides, that is, in the place where its principal office is located. Prior to 1889 the law required the property to be returned to the comptroller-general for State taxation, and to the proper officers of the county and municipality for county and municipal taxation. Under that system, if there had been a disagreement between the company and the tax officers in reference to the value of the property, it was in a position where it might be assessed at one value for State taxation and at another value for county taxation, and still another value for municipal taxation. Under the present system this would be impossible, as the return for all the purposes of taxation is made to one officer and an assessment by him for State taxes is to be followed when county and municipal taxes are to be collected. There was no error in refusing to enjoin the execution from proceeding, on the ground that the assessment should have been made and the execution should have been issued by·the proper tax officer of Richmond county instead of the comptroller-general of the State.

21. The general rule is that taxes as such do not bear interest. The taxpayer is only required to pay interest in those cases where the statute requires it to be done. *Ga. R. Co.* v. *Wright, 124 Ga.* 596. In 1889 the General Assembly passed an act which declared "all executions issued for taxes . . shall bear interest at the rate of seven per cent. per annum from the time fixed by law for issuing the same." (Acts 1889, p. 31; Pol. Code, §§731, 887.) It is said that this act, properly construed, does not declare that taxes shall bear interest, but that only an execution for taxes shall bear interest. We think this a proper construction of the act. If a taxpayer tenders the amount of taxes due from him before an execution is actually issued, no interest on the tax can be lawfully required of him. But if he fails to pay his taxes until after the execution is issued, he must pay interest; and the question is, from what time shall the interest be calculated? An answer to this must appear from the statute, and is contained in the words, "the time fixed by law for issuing" the execution. What time does the law fix for issuing an execution for taxes? The day following the last day that the law allows for the payment of taxes. When a taxpayer has failed to pay his taxes within the time required by

law, the tax officer is authorized, under the law, to immediately issue an execution against him.  The delay of the officer in issuing the execution may permit the taxpayer to come in and tender his taxes without interest before the execution is issued.  But whenever the execution is issued, no matter at what time, provided it is issued within the time authorized by law, it bears interest from the time it might have been issued in the first instance.  As the taxes sought to be collected in the present case were due on the 20th day of December, in each year in which they were payable, the comptroller-general had the right, under the law, to issue the executions immediately after that day in each year.  If the plaintiff had not desired to pay interest on the executions, it should have tendered to the comptroller-general the amount of its taxes before the executions were actually issued.  Once issued, they carry interest from the day on which they could have been first lawfully issued.

Lord Nottingham, the author of the statute of frauds, in a decision relating to a provision in that statute, says: "I have some reason to know the meaning of this law; for it had its first rise from me, who brought in the bill into the Lords' house, though it afterwards received some additions and improvements from the judges and the civilians."  Lord Campbell said, in reference to this remark, "If Lord Nottingham drew it, he was the less qualified to construe it, the author of an act considering more what he privately intended than the meaning he has expressed."  4 Campbell's Lives of the Chancellors, 228.  It so happens that I was the author of the act of 1889, providing that tax executions should bear interest.  If Lord Nottingham was right, I know more about what it means than any one else.  If Lord Campbell is correct, I know less.  It being my duty, however, to construe the act, I have endeavored to do so, and so far as possible to eliminate from consideration the motive and circumstances which impelled me to frame the bill and request its introduction in the General Assembly.  Whether I have been controlled by what I intended, more than by what I expressed, I do not know; but the construction placed upon the act in the present case seems to me the true interpretation of the words used.  Perfect candor, however, requires the statement that the construction now placed on the words of the act is precisely what I privately intended.

22, 23.  If a taxpayer causes an injunction to issue to prevent the

collection of a tax, and, under the final decree, liability for the tax is established, of course the taxpayer is not relieved from interest on the tax execution pending the proceedings in which he obtained the injunction. This proposition, of course, can not be seriously questioned; and we do not understand that it is questioned in this case. But it is said that from April 19, 1902, to January 10, 1905, both the comptroller-general and the Georgia Railroad & Banking Company were under an injunction from the circuit court of the United States for the northern district of Georgia, restraining the former from assessing or collecting any tax upon the stock involved in the present case, and restraining the latter from returning the same for taxation or paying any taxes thereon; and that on account of this condition of affairs the State should not exact interest from the taxpayer on the tax subsequently declared valid during the period above referred to. It is true that the plaintiff in the present case was a defendant in that case. It is also true that it was not an active defendant. It was thoroughly complacent. If it did not agree with the contention of the complainant that the stock was not taxable, it certainly did not raise its voice in protest against that position. When the circuit court held that the property was not taxable, it declined to unite with its codefendant in an appeal from that decision. It did not occupy in that litigation the position of a taxpayer willing to pay its taxes, who was prevented from doing so by the strong arm of the law. As soon as it was finally determined in that case that the stock was taxable, the complacent defendant of that proceeding became the active plaintiff in a proceeding in a State court, in which the same contentions were set up as were set up by the complainant in the United States court. It has never admitted to this day that it was liable for any taxes on this property. There is nothing in the circumstances as they appear in the record of the case in the United States court, taking it alone, or as they appear in the record in this case, taking it alone, or as they appear taking the two records together, which places the plaintiff in a position where it was the holder of a fund belonging to another party that it was willing to pay over, its failure to pay being alone the result of a process of a court of competent jurisdiction. In the proceeding in the State court its avowed position is that there is no liability upon it whatever. In the United States court it silently acquiesced in a posi-

tion to that effect, taken by its lessee, who under contract with it was bound to pay all taxes upon the property. There seems to be—a general rule that when a party is restrained by injunction from paying over funds in his hands to the person entitled thereto, he will not be chargeable with interest while so restrained. 16 Am. & Eng. Enc. L. (2d ed.) 1068. Wherever a person has funds in his hands belonging to another party and is willing to pay them over, or where a person owes a debt and is willing to pay it, and the person having the funds or owing the debt is restrained by an injunction, and there is no way in which the money can be paid into court so as to relieve him, it would be equitable and just that, during the pendency of the proceeding which he had no part in instituting, he should be relieved from interest on the debt. But this rule can not be applicable to the case of a party who does not admit that he has funds in his possession, and does not admit any liability for a debt to any one, but, under one set of circumstances, silently acquiesces in the proposition that no debt is owed, and under other circumstances positively asserts that there is no liability. If there is any authority for the proposition contended for in this case, it has not been called to our attention. In *Little* v. *Owen,* 32 *Ga.* 20, the rule is stated that interest is suspended against a garnishee during the pendency of the garnishment. At that time there was no law authorizing a garnishee to pay money into court. Judge Lumpkin, in the opinion, said: "He could not pay it, of course, to the defendant. It would seem reasonable, therefore, that the interest should be suspended during that time. Besides, the defendant will not lose it. He can sue Dickerson on his bond, and the lost interest will constitute an item of damage which Little has sustained by reason of suing out the garnishment. We express no opinion whether Owen might not have been protected, had an order been taken requiring him to pay the money into court, although we see no authority under the statute for such a proceeding.". In Branthwait v. Halsey, 9 N. J. L. 4, the obligee of a bond, for the purpose of having it collected, made an unconditional assignment to B, and afterwards, fearing that B would appropriate the money to his own use, filed a bill in equity to restrain the obligor from paying the money to B, and B from receiving it. It was properly held in that case that during the continuance of the injunction sued out by the obligee against the obligor, the obligor was not liable for inter-

est.     That was a case, in effect, where a creditor enjoined a debtor from paying his debt to him, and under such circumstances it would be inequitable to require the debtor to pay interest to one at whose instance he was enjoined from paying the debt.     In the opinion in that case several cases are cited.     In one it was held that a debt due from an American debtor to a British creditor did not bear interest during the revolutionary war, and that interest was abated until the return of peace.     Carnes *v.* Penn, 1 Peters, 524.     A similar ruling was made by the Supreme Court of Pennsylvania, in Hoar *v.* Allen, 2 Dallas, 102.     In McCall *v.* Turner, 1 Call, 133, the Court of Appeals of Virginia held that where a creditor by his own act puts it out of the power of a debtor to make payment, interest is not recoverable.     There are other cases referred to in which it was held that interest would not run where the debtor was restrained from the payment of the debt by the operation of a foreign attachment.     Chief Justice Ewing, who delivered the opinion in the New Jersey case, after referring to the cases above cited sums up the principle in these words: "The principle of these cases is, that when *payment* is prevented by the interposition of the law or the act of the creditor, interest is not recoverable."     It certainly can not be the law that a landlord is relieved from interest on tax executions during a period of time when he is enjoined from paying taxes at the instance of a tenant, who under the lease is liable for the taxes, where the landlord takes no steps to relieve himself from the process sued out by the tenant, and silently acquiesces in the contention of the tenant that no tax is due.

24-27.  The law requires that the returns for taxation of all railroad companies shall be made to the comptroller-general by the first day of May in each year.  (Pol. Code, §805.)  Upon failure to make the return the comptroller-general is authorized to make an assessment, from the best information he can obtain, and to issue an execution against the company for the amount of the taxes due, according to law.  (Pol. Code, §§780, 813, 874.)  It was held in the former decision in this case that these sections of the code were applicable whether there was an entire failure to make a return, or only an incomplete and partial return.  The stock involved in the present controversy should have been returned by the plaintiff for taxation by the first day of May in each of the years from 1895 to 1901 inclusive.  No such return was made for these years.  There

was nothing to prevent a return in any of these years. The authority of the comptroller-general to make an assessment on the stock from the best information he can procure was therefore complete, so far as these years were concerned. On April 19, 1902, the injunction of the United States circuit court issued, which restrained the comptroller-general from assessing or collecting any taxes upon the stock for any year, and also restrained the plaintiff from returning the stock for taxation or paying taxes thereon. This injunction was finally dissolved on January 10, 1905. On February 7, 1905, the comptroller-general assessed the value of the stock for taxation for each year from 1895 to 1904 inclusive, and issued executions for the amount of taxes due on such assessment for each of these years. At this date the comptroller-general was fully authorized to assess the stock and issue the executions for the years 1895 to 1901. But was he on that date authorized to assess the stock for the years 1902 to 1904? When the injunction issued by the circuit court was finally dissolved on January 10, 1905, the status of the railroad company as to returning the property for taxation should have been restored, as near as possible, as it existed at the time it was issued, so far as the return for 1902 was concerned, and the same length of time should have been allowed for a return for the years 1903 and 1904 as the law allowed during those years. When the injunction issued April 19, 1902, the railroad company had remaining twelve days of the time allowed by law to make a return. It should have made a return within this time, after the date of the dissolution of the injunction. Having failed to do so, the comptroller-general, after the expiration of this time, was authorized to proceed to assess the property and issue the execution. The law allowed the plaintiff from the first day of January to the first day of May, in each of the years 1903 and 1904, to return the stock for taxation, that is, a period of four months. This time should have been allowed to the railroad company to make the returns, before the assessments were made. The assessment was made on February 7, 1905, for the years 1903 and 1904, and was therefore premature and void, and the executions issued for those years should have been enjoined. See, in this connection, *State* v. *Southwestern Railroad,* 70 *Ga.* 12 (3). The railroad company failed to make a return within four months from the time of the dissolution of the injunction, and has not yet made any return.

The time for the return having now expired, the company is to be treated as a defaulter for these years, and the comptroller-general may proceed to assess the stock and issue executions for the taxes due. The executions for the years 1903 and 1904, heretofore issued, should be returned to the office of the comptroller-general and cancelled.

28. The plaintiffs contend that the valuation placed by the comptroller-general upon the stock was excessive. The defendant contended that, as the plaintiff was a defaulter, the valuation of the comptroller-general was conclusive, under the law. In an amendment to the answer the defendant alleged that the valuation placed upon the stock by the plaintiff was not its true market value, "but on the contrary the true market value is as assessed by the comptroller-general," and concluded the amendment with a prayer "that the court may so find and decree." The plaintiff objected to the allowance of this amendment, on the ground that the court was without jurisdiction to assess or revalue the same for the purpose of taxation, and that the prayer was vague and indefinite. The court ruled that it could not in this case decide or fix the value of the stock for the purpose of determining the amount for which the execution should proceed, but that it would hear evidence with a view of determining whether the assessment was excessive, and refused to strike the prayer. Evidence was heard in reference to the method adopted by the comptroller-general in reaching the valuation placed by him upon the stock, and there was a finding, in the final decree, that the valuation was not excessive. As has been said, there was evidence justifying this finding of fact. Under the circumstances, even if there was any error in refusing to strike the prayer of the amendment to the answer, the error was not of such character as to require a reversal of the judgment.

29. The foregoing discussion disposes of all the questions made in the record, which in our opinion are not concluded by the former decision. The rulings in the former decision are affirmed and adhered to. Upon further consideration and reflection, they are altogether satisfactory; and even if they were not so, we would be constrained to follow them as the law of this case. *Southwestern R.* v. *Wright,* 68 *Ga.* 312 (7). The judgment will be affirmed, with direction that the decree be so amended as to enjoin the ex-

ecutions issued for the taxes for the years 1903 and 1904 from proceeding, and in all other respects stand as rendered.

　　*Judgment affirmed, with direction.　All the Justices concur.*