12499

WINGFIELD *ET AL.* v. SOUTH CAROLINA TAX COMMISSION *ET AL.*

O'DOWD *ET AL.* v. SAME

(144 S. E., 846)

June, 1928.

*Messrs. Melton & Belser,* for petitioners,

*Attorney General John M. Daniel and Assistant Attorney Generals Cordie Page and J. Ivey Humphrey,* for respondents,

September 25, 1928.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

The petitioners in both of the above-entitled proceedings instituted in the original jurisdiction of the Court, seek to have declared null and void Act No. 574 of the Legislature, passed at its 1928 session and approved by the Governor

March 10, 1928. The two actions are similar, and cover in part the same points; they were heard together on argument here, counsel for petitioners filing one brief covering the several questions raised in the two cases. In our considera- tion of these questions, we shall follow, in the main, the plan outlined by the petitioners in their printed argument, and the conclusions arrived at by the Court will dispose of all questions raised in both cases.

The constitutionality of the statute is attacked upon three general grounds: (1) The origin and method of passage of the Act; (2) its operation and effect; and (3) its vague- ness and uncertainty. Under their first general objection, and in amplification of same, the petitioners state the follow- ing specific grounds: (a) That the Act, one for the raising of revenue, did not originate in the House of Representa- tives; (b) that it was not read three times in either House; and (c) that the subject of the Act is not expressed in the title. In amplification of their second general objection, and as specific grounds of same, the petitioners contend, as to retailers of soft drinks, that the provisions of the Act (d) deprive such retailers of their right to carry on their occu- pation and of their liberty to contract, and (e) impose un- equal operation and discrimination against them; that as to theater owners affected by admissions tax, (f) they are de- prived of liberty to contract by requirements as to the use of tickets, and that (g) such operators using their own tickets are required by the Act to pay a double tax. Under the third general objection it is contended that the uncer- tainty and vagueness of the Act is evident from its prohibi- tion of "practices" making inspection "difficult" and from alternative provisions. These enumerated objections are pleaded in detail, and the petitions set out various particulars in which the Act is alleged to be unreasonable, unjust, dis- criminatory, and in violation of the Constitution.

With respect to Subdivision (c), for the sake of clarity, we may say that the petitioners do not contend that the sub- ject of the Act is not expressed in the title of the enrolled

Act; their objection is that the title was changed after the Bill was introduced in the Legislature, and that the title as it appears in the enrolled Act was never passed by either House of the Legislature. The respondents, as constituting the South Carolina Tax Commission, by their answers allege that the statute is a valid and constitutional enactment; that the record shows that the Bill originated in the House of Representatives, was read three times on three separate days in each House, and that the subject of the Act is properly expressed in the title; that the law is now of force and cannot be impeached by the journals of the two Houses, nor by any other extrinsic evidence; that the tax imposed is not a property tax, but a license tax; and that "Sec. 1 of Art. 10 of the Constitution specifically provides 'that the General Assembly may provide for a graduated tax on incomes, and for a graduated license on occupations and business'; that the tax herein imposed is a license tax operating equally on all persons within the respective classes, is a valid and proper enactment of the General Assembly in accordance with both the State and Federal Constitutions, and does not deprive any person of property without due process of law, nor deny to any person the equal protection of the laws." They also allege that the petitioners have an adequate remedy at law, by paying the tax under protest and suing to recover the same.

We approach the consideration of the questions raised by the petitioners with due appreciation of their importance and seriousness. We are also mindful of the fact that it is a grave matter to declare a solemn enactment of the Legislature, a co-ordinate branch of the government, invalid, and that the Court in its deliberation and conclusions should be guided by the well-settled principle that the unconstitutionality of an Act must be shown beyond a reasonable doubt. *McKiever et al. v. City of Sumter et al.*, 137 S. C., 266; 135 S. E., 60. *Poulnot v. Cantwell*, 129 S. C., 171; 123 S. E., 653. *Battle v. Willcox*, 128 S. C., 500; 122 S. E., 516. *Santee Mills v. Query*, 122 S. C., 158; 115

S. E., 202. *Powell v. Hargrove,* 136 S. C., 345; 134 S. E., 380. We find the following clear statement of this principle in 6 R. C. L., at page 75:

"To justify a Court in pronouncng a legislative Act unconstitutional, or a provision of a State Constitution to be in contravention of the Constitution of the United States, the case must be so clear as to be free from doubt, and the conflict of the statute with the Constitution must be irreconcilable, because it is but a decent respect to the wisdom, the integrity, and the patrotism of the legislative body by which any law is passed to presume in favor of its validity until the contrary is shown beyond reasonable doubt. Therefore, in no doubtful case will the judiciary pronounce a legislative Act to be contrary to the Constitution. To doubt the constitutionality of a law is to resolve the doubt in favor of its validity."

The Act in question is a revenue measure, the title being as follows:

"An Act to amend an Act entitled 'An Act to raise revenue for the support of the State government,' approved twenty-second day April, 1927, so as to repeal the license tax on sporting goods, cut glass, etched glass, art glass, and 22 calibre cartridges and to provide for a license tax on soft drinks, admissions, contractors, ammunition, candy, playing cards, manufactured tobacco products and chain stores and to levy a tax on documents, for the support of the State government."

I. The provisions of the State Constitution, alleged by the petitioners, under their first general ground of objection, to have been violated in the origin and passage of the Act, are the following sections of Article 3:

"15. Bills for raising revenue shall originate in the House of Representatives, but may be altered, amended or rejected by the Senate; all other Bills may originate in either House, and may be amended, altered or rejected by the other."

"17. Every Act or resolution having the force of law shall relate to but one subject, and that shall be expressed in the title."

"18. No Bill or Joint Resolution shall have the force of law until it shall have been read three times and on three several days in each House, has had the great seal of the State affixed to it, and has been signed by the President of the Senate and the Speaker of the House of Representatives: *Provided,* That either branch of the General Assembly may provide by rule for a first and third reading of any Bill or Joint Resolution by its title only."

The petitioners point to the journals of the two Houses to substantiate their contention as to the irregularities alleged. The respondents, however, without admitting that the journals show any of the irregularities complained of, contend that they are not competent evidence, and that—

"It is a well-settled rule in this State that the Act itself is the best evidence of its passage, and when it is duly certified by the President of the Senate and Speaker of the House of Representatives, approved by the Governor and filed in the archives of the Secretary of State, it cannot be impeached by the journals or any other evidence outside of the Act itself."

The question whether resort may be had to the journals of the Legislature for the purpose of impeaching an Act regular on its face is one about which the decisions in the various jurisdictions are not in harmony. The conflicting views are well stated in 25 R. C. L., at page 894:

"It is held by one line of cases that a duly authenticated approved, and enrolled statute imports absolute verity, and is conclusive that the Act was passed in every respect as designated by the Constitution; and, by another, that while such authentication, approval, and enrollment are strong *prima facie* evidence that it was regularly passed, still this presumption may be overcome by resorting to the legislative journals. These rules have sometimes been respect-

ively called the 'enrolled Bill rule' and the 'journal entry rule.'"

Prior to 1893, the journal entry rule prevailed in this State. *State v. Platt,* 2 S. C., 150; 16 Am. Rep., 647. *State v. Hagood,* 13 S. C., 46. In each of these cases, however, a vigorous dissenting opinion was filed. In his dissent in the *Hagood case,* Mr. Justice McIver said:

"The true rule, in my judgment, is that when an Act has been enrolled, has had the great seal of the State affixed to it, has been signed by the President of the Senate and and Speaker of the House of Representatives and has been approved by the Governor, it imports absolute verity; that its terms can only be finally ascertained by an inspection of the enrolled Act, and that it is not competent to go behind it, and alter its terms either by entries in the journals of the two Houses or any other evidence."

In the case of *State ex rel. Hoover v. Chester,* 39 S. C., 307; 17 S. E., 752, decided in 1893, the question was again considered. In a unanimous opinion the Court overruled the *Platt* and *Hagood cases,* and adopted the enrolled Bill rule in the following unmistakable language:

"We announce that the true rule is, that when an Act has been duly signed by the presiding officers of the General Assembly, in open session in the Senate-House, approved by the Governor of the State, and duly deposited in the office of the secretary of State, it is sufficient evidence, nothing to the contrary, appearing upon its face, that it passed the General Assembly, and that it is not competent either by the journals of the two houses, or either of them, or by any other evidence, to impeach such an Act. And this being so, it follows that the Court is not at liberty to inquire into what the journals of the two houses may show as to the successive steps which may have been taken in the passage of the original Bill."

Reasons for the adoption of the rule become apparent upon consideration. Public policy, certainty as to what the law

is, convenience, and that respect due by the Courts to the wisdom and integrity of the Legislature, a co-ordinate branch of the government, all require that the enrolled Bill, when fair upon its face, should be accepted without question by the Courts. 26 Am. & Eng. Ency. of Law, p. 557. *State of Washington, ex rel. Thomas M. Reed, Jr., v. W. C. Jones, Attorney General,* 6 Wash., 452; 34 P., 201; 23 L. R. A., 340. *Atchison Railway Co. v. State of Oklahoma,* 28 Okl., 94; 113 P., 921; 40 L. R. A. (N. S.), 1. *Field v. Clark,* 143 U. S., 649; 12 S. Ct., 495; 36 L. Ed., 294, and the cases cited therein. In 25 R. C. L., at page 896, we find:

"It has been declared that the rule against going behind the enrolled Bill is required by the respect due to a coequal and independent department of the government, and it would be an inquisition into the conduct of the members of the Legislature, a very delicate power, the frequent exercise of which must lead to endless confusion in the administration of the law. The rule is also one of convenience, because Courts could not rely on the published Session Laws, but would be required to look beyond these to the journals of the House and Senate and often to any printed Bills or amendments which might be found after the adjournment of the General Assembly. Otherwise, after relying on the *prima facie* evidence of the enrolled Bills, authenticated as exacted by the Constitution, for years, it might be ascertained from the journals that an Act theretofore enforced had never become a law."

And in Am. & Eng. Ency. of Law, supra:

"The reason for this view seems to be that by most Constitutions it is provided that a journal must be kept, but the particular method of keeping it and of its authentication is not generally specified; while, on the other hand, the method of authenticating and filing the enrolled Bill is either so specifically prescribed or so well established that it may be persumed that the framers of the. Constitutions intended that the authenticated bill and not the journals should con-

stitute the solemn record, and that the constitutional requirement that journals shall be kept is rather to insure publicity to legislative proceedings than to make the journals the best or the conclusive evidence on the question whether a Bill was in fact passed."

And in the *Reed case, supra:*

"For a number of years after the passage of an Act it may be given force by the Courts by reason of the *prima facie* presumption flowing from the finding of the Act regularly enrolled and signed in the office of the Secretary of State. Then after said Act to all intents and purposes has been treated as in force during all of these years, upon the suggestion of some person that there was a fatal omission in the journal entries regarding the passage thereof, the Court must take judicial notice of such fact, if shown by the journal, and from that time on it must be held, not only that such bill was not then a law, but that it never had been such. The confusion as to rights and duties growing out of such a state of uncertainty as to what the statute law of the State is may well appall one who even superficially contemplates the same. * * * If from the enrolled Bill on file it can be conclusively presumed that it has been regularly enacted by the Legislature, none of these evil consequences will follow, and the duty of the Courts will be confined exclusively to ascertaining the effect of such law. It follows that, as a matter of public policy, as well as of convenience and certainty, the Court should adopt the rule which makes such enrolled Bills conclusive evidence of their regular enactment, if it can do so without violating some fundamental constitutional provision or well-settled rule of construction."

The *Chester case, supra,* is conclusive of the questions raised by the petitioners in the present case under their first general objection. The enrolled bill appears regular upon its face: It was duly signed by the President of the Senate and the Speaker of the House of Representatives, approved by the Governor, and filed in the office of the Secretary of

State with the great seal of the State affixed. Having been properly authenticated as required by the Constitution, it becomes the "sole expository of its own contents and the conclusive evidence of its existence and valid enactment," and this Court cannot look to the journals of either house, or to other extrinsic evidence, in order to ascertain its history or its provisions, or to inquire into the manner of its enactment. The Court in the *Chester case,* in announcing "the true rule," added:

"It will be observed that this conclusion by no means negatives the power of the Court to inquire into those prerequisites fixed by the Constitution, and of which prerequisites the journals of the two houses are required to furnish the evidence. Such, for instance, as the organization of the two houses, the presence of a quorum, the votes of two-thirds of the members by ayes and noes to be entered on the journals in certain cases."

In the present case the alleged conflict between the legislative journals and the authenticated Act consists entirely of matters not expressly required by the Constitution to be entered upon the journals. The Constitution does not specifically require that the journals shall show the contents of a bill or its title, nor the number of times and days that it has been read in either or both houses, nor the house in which it originates. Therefore these are not prerequisites fixed by the Constitution to be entered upon the journals, to be resorted to as evidence in determining the validity of an Act as to its origin and passage.

It is contended, however, that the irregularities complained of as being evidenced by the legislative journals likewise appear upon the face of the enrolled Bill. Counsel for the petitioners in his argument also refers to the "original Bill" and the "original manuscript" as showing the alleged irregularities. It is only necessary to say that we have made a careful examination of the enrolled Bill filed in the office of the Secretary of State, and that we find on its face no evi-

dence of such irregularities. If by the "original Bill" or the "original manuscript" is meant some document or paper other than the enrolled Bill, then, under the rule adopted and of force in this State, the Court may not look to such extrinsic evidence for the purpose of impeaching the enrolled Act.

II. The taxes under consideration are not property taxes, but are license taxes on occupation or business. "The phrase 'license tax' implies a burden on that which is not property, but results from its enjoyment or the conduct of the business or calling, or on a civil right and privilege." 17 R. C. L., 474. The petitioners do not deny that, generally speaking, the State has authority to impose license taxes, if, in their imposition, the constitutional rights of the citizen are not violated or contravened. In 37 C. J., 173, we find:

"Subject to the limitations or restrictions imposed by the Constitution of the United States, or by the State Constitution, and to the limitation that no federal right be interfered with, a State Legislature may, either in the exercise of the police power or for the purposes of revenue, require licenses or impose license taxes on occupations or privileges within the limits of the State, when it deems them to be warranted by considerations of public interest and for the general welfare."

At page 186 of the same volume it is said:

"A statute or ordinance licensing or taxing an occupation or privilege must be reasonable in its terms and conditions; if it imposes a license or tax in such a manner or upon such terms as to be unreasonable, oppressive, or in restraint of trade, it is void."

In this State the imposition of a license tax is permissible under Article 10, Section 1, of the Constitution, which specifically provides:

"That the General Assembly may provide for a graduated tax on incomes, and for a graduated license on occupations and business."

The objection of the petitioners is to particular provisions of the Act as depriving them of their property and rights without due process of law and of the equal protection of the laws, in violation of Section 5 of Article 1 of the State Constitution and the Fifth and Fourteenth Amendments to the Federal Constitution.

As to retailers of soft drinks, the petitioners say, in the first place, subdivision (d), that the Act so operates in effect as to deprive the retailers of soft drinks of their constitutional right to carry on their occupation and of their liberty to contract. In support of their contention, they point to the provisions of the Act which—(1) Require retailers to mail within five days duplicate invoices to the Tax Commission; (2) require stamping and cancellation of stamps; (3) require keeping records of all purchases and sales; and (4) authorize the Tax Commission to prescribe kinds and forms of containers to be used by retailers.

The Court's attention is especially directed to the provisions of the Act requiring dealers to keep permanent records of all purchases and sales as being unlawful regulation of the business of the petitioners, and also to the requirement that dealers shall use only the kinds and forms of containers to be prescribed by the Tax Commission as a violation of the rights of the petitioners to purchase and use such containers as they wish and as may be adapted to their needs. The right to impose a tax carries with it the right to make reasonable regulations for its collection. 37 Cyc., 1190:

"The sovereign power to lay and assess taxes necessarily implies authority to provide means for enforcing their collection, and it belongs to the Legislature of a State to prescribe the remedies by means of which this shall be accomplished, and from time to time to change the same, in its discretion, there being no such thing as a vested right in

the continuance of a mere remedy, subject only to the limitation that the taxpayer shall not be deprived of his property without due process of law, and that, whatever methods of collecting the taxes are ordained, they shall apply uniformly to all persons or property of the same class or kind."

The question before us is: Are the regulations provided for the collection of the tax so unreasonable and oppressive as to deprive the petitioners of their constitutional rights as alleged?

"In the absence of positive evidence to the contrary, however, such Acts or ordinances are presumed to be reasonable, and the Courts will not interfere unless their unreasonableness and oppressiveness is clearly apparent, the burden of proving their unreasonableness or invalidity being on the one who asserts it, usually the licensee." 37 C. J., 186.

The provision of the Act referred to in clause (1), requiring the mailing of duplicate invoices to the Tax Commission, is in the same general class with the provision referred to in clause (3), requiring the keeping of records, and both are of a general character or nature peculiarly appropriate to the collection of license and other excise taxes. Where property is sought to be taxed, it is comparatively an easy matter to locate and list same and assess the tax; but, where a graduated license tax is laid upon a business or occupation, it is of the essence of administration that the tax-collecting body shall have complete and accurate information as to the amount of business done by the taxpayer. We can conceive of no better source from which such information can be obtained than the records of the licensee or taxpayer himself, and if the provisions requiring him to keep such records and make reports are not unreasonable and oppressive—and the reasonableness of such regulations, in the first instance, will be presumed—then such provisions are not in violation of any constitutional right of the taxpayer or licensee and will be sustained.

As to the provision of the Act referred to in clause (2), requiring affixing and cancellation of stamps, it is hardly necessary to do more than to say that this method of collecting taxes is in very general use, being particularly familiar through the Federal Revenue Acts, and has proved to be practicable and comparatively simple in operation. Various features of this plan of taxation have been passed upon by the Courts, and we know of no case in which such a provision as the one under consideration has been declared invalid. Nor do we think that, from the standpoint of reason, such method could be held unreasonable or oppressive.

With respect to the provision of the Act referred to in clause (4), authorizing the Tax Commission to prescribe the kinds and forms of containers to be used by dealers, the wisdom of fitting the regulations to the business to which they are intended to apply should be kept in mind. The syrups handled by retailers of soft drinks are bought and kept in bulk, the tax being laid upon them in mass per gallon. To the containers of such syrups stamps are required to be affixed as evidence of payment of the tax. If every dealer should be allowed to choose his own containers, complete lack of uniformity as to kind and size and uncertainty as to gallon contents of containers would unquestionably follow, the determination of the amount of the tax, in the form of stamps to be affixed to the various containers, would be greatly complicated, and the collection of the tax interfered with and made difficult. In addition, the trouble and expense of ascertaining the gallon contents of individual containers used by the various dealers would bear more heavily upon the taxpayer and upon the state; it is conceivable that the hardship to the taxpayer in such case would be greater than that, if any, devolving upon him through the use of containers prescribed by the Tax Commission. The provision under consideration is appropriate to the nature of the business, facilitates and makes simple the collection of the tax,

and accords to every dealer of the class named exactly the same treatment.

On the whole, a careful examination of the provisions of the Act here objected to discloses no reasonable ground for complaint. If, in the collection of the tax imposed, loose and inefficient regulations were provided, it is evident that the law, as a tax measure, would be rendered practically ineffective, the doors thrown wide to dishonest practices by those seeking to evade the tax, and an unfair burden imposed upon honest dealers. The provisions here attacked seem to us to make the law effective and to make certain a general and fair enforcement of the collection of the tax. Some burden, of necessity, is imposed upon the taxpayer in the collection of any tax whatever; but we do not think that the provisions under consideration impose any undue or oppressive burden upon dealers in soft drinks, nor that they are unreasonable or unfair, nor that they in any manner contravene any constitutional right, State or Federal, of the petitioners.

As to subdivision (e), the petitioners submit that the Act operates unequally upon and discriminates against the retail dealers in soft drinks in numerous ways, and especially in favor of the bottlers, in that: (1) Discounts of from 5 to 10 per cent. are allowed larger purchasers and bottlers using crowns; (2) retailers are required to pay a straight tax of 76 cents per gallon, while bottlers pay only 1 cent for each 5 cents of retail selling price; (3) retailers are required to affix stamps within 24 hours after syrups are received, while bottlers pay only after syrups are manufactured and ready for sale; (4) retailers are required to affix stamps and mail invoices, but bottlers are not so required; (5) retailers are required to affix stamps either to containers or bottles, while bottlers are allowed to use crowns; and (6) retailers are not allowed to receive the tax stamps on consignment, upon execution of bond, etc.,

while manufacturers, wholesalers, and jobbers are allowed to do so.

As to clause (1) : There is no discrimination whatever; any one who buys stamps or crowns in certain specified amounts is entitled to certain specified discounts.

As to clauses (2), (3), (4), and (5), the contention is that, while there is no proper basis for discrimination as between bottlers and retailers of soft drinks, such discrimination is made by the Act, in that the bottlers, who use the same syrups as the retailers of soft drinks, pay a less or different tax from that paid by the soda fountain operators, who manufacture drinks from their syrups and sell them in glasses; and that the classification attempted to be made is not valid, because unreasonable and arbitrary. In *Lillard v. Melton,* 103 S. C., 10; 87 S. E., 421, the Court observes that it is generally held that the equality and uniformity clause of the Constitution is applicable only to a property tax. See, also, *Hill v. Abbeville,* 59 S. C., 396; 38 S. E., 11. In 17 R. C. L., at page 483, it is said:

"A decided majority of the cases hold that the constitutional provision which imposes equality and uniformity of taxation has no application to an occupation or license tax, but is limited to a direct property tax, which is assessed and collected in the usual way, although the license fee may be regulated by the amount of business done, with a provision for the privilege of paying a maximum fixed amount instead."

See *State v. Applegarth,* 81 Md., 293; 31 A., 961; 28 L. R. A., 812. *State ex rel. Toi v. French,* 17 Mont., 54; 41 P., 1078; 30 L. R. A., 415. *Stull v. De Mattos,* 23 Wash., 71; 62 P., 451; 51 L. R. A., 892. *Ellis v. Frazier,* 38 Or., 462; 63 P., 642; 53 L. R. A., 454. *Salt Lake City v. Christensen Co.,* 34 Utah, 38; 95 P., 523; 17 L. R. A. (N. S.), 898. *Fleetwood v. Read,* 21 Wash., 547; 58 P., 665; 47 L. R. A., 205. *Denver City R. Co. v. Denver,* 21 Colo., 350; 41 P., 826; 29 L. R. A., 608; 52 Am. St. Rep., 239. *Bir-*

*mingham v. Goldstein,* 151 Ala., 473; 44 So., 113; 12 L. R. A. (N. S.), 568; 125 Am. St. Rep., 33.

Regardless of whether constitutional provisions as to equality and uniformity are applicable to license taxes, it is too well settled to admit of argument that occupations and forms of business may be classified for the purpose of such taxation. 1 Cooley on Taxation (4th Ed.), 746. However, such classification must be reasonable, and not arbitrary, and the tax imposed must fall alike on all persons of the same class. The classification may go even further, and subdivisions or subclassifications may be made where a reasonable basis of distinction exists. It has been held that legislative classification for taxation may be founded, not only the nature of the article sold, but upon the manner of conducting the business. In 37 C. J., 201, we find:

"In accordance with the principles heretofore stated, a license or occupation tax is valid, under the various constitutional provisions relating to equality and uniformity, if it applies equally and without discrimination to all persons engaged in the same particular business or avocation, or exercising the same privileges, or if the occupations or privileges and the persons engaged therein are classified for taxation according to reasonable and well-recognized lines of distinction, it does not matter how few the persons are who may be included in a class, so long as all who are or may come into the like situation or circumstances are embraced in the class. Within this latter rule persons engaged in the same business or avocation may be subclassified, for the purpose of exempting or imposing different rates of occupation taxes, as: Wholesaler and retailer; peddlers or itinerant dealers, and merchants having a permanent place of business; or money lenders, excepting banks or similar institutions. So, also, businesses may be classified, and different rates of taxation imposed, according to the different articles sold, and vehicles may be classified according to type, size, use, horse power, etc., such as motor vehicles and horse-

drawn vehicles, or vehicles used by owner or his family for private use and those used for commercial purposes."

In 17 R. C. L., at page 518, we find:

"Under the rule that classification of occupations or forms of business may be made wherever the difference or distinction on which it is founded is not wholly without reason, it is an established rule that those who follow a commonly designated business or vocation may, where a basis for reasonable distinctions exists, be reclassified or subdivided into new and separate classes. In this connection it has been declared that the legislative classification may be founded on the nature of the articles sold, as well as on the manner of conducting the business. Accordingly, it has been held that discrimination between merchants having fixed places of business in the municipality and also persons 'selling to the trade' on the one hand, and retail dealers who have no regular place of business on the other hand, is not unlawful for the purpose of license taxes. Other examples of the application of the rule involve the subclassification of keepers of restaurants, peddlers, money lenders, commission merchants, farmers, railroads, and owners of vehicles. While a subclassification may be proper, it will be apparent that the taxing power cannot unjustly discriminate between the subdivisions so made."

In 1 Cooley on Taxation (4th Ed.), 748, it is said:

"So persons of the same class may be subdivided according to certain differences, provided the subclassification is reasonable, and the tax graduated accordingly or one or more subclasses may be exempted."

See, also, the following cases: *Hill v. Abbeville,* 59 S. C., 396; 38 S. E., 11. *Cowart v. Greenville,* 67 S. C., 35; 45 S. E., 122. *Ex parte Williams,* 31 Tex. Cr. R., 262; 20 S. W., 580; 21 L. R. A., 783. *Crowley v. Ellsworth,* 114 La., 308; 38 So., 199; 69 L. R. A., 276; 108 Am. St. Rep., 353. *Sperry & H. Co. v. Melton,* 69 W. Va., 124; 71 S. E., 19; 34 L .R. A. (N. S.), 433. *Freadrich v. State,* 89

Neb., 343; 131 N. W., 618; 34 L. R. A. (N. S.), 650. *State v. Alston,* 94 Tenn., 674; 30 S. W., 750; 28 L. R. A., 178. *Commonwealth use of Titusville v. Clark,* 195 Pa., 634; 46 A., 286; 57 L. R. A., 348; 86 Am St. Rep., 694. Affirmed in *Clark v. Titusville,* 184 U. S., 329; 22 S. Ct., 382; 46 L. Ed., 569. *Commonwealth v. Delaware Div. Canal Co.,* 123 Pa., 594; 16 A., 584; 2 L. R. A., 798. *Ex parte Byles,* 93 Ark., 612; 126 S. W., 94; 37 L. R. A. (N. S.), 774. In *re Wolverine Oil Co.,* 53 Okl., 24; 154 P., 362; L. R. A., 1916-F, 141.

The question, then, here presented, is whether the classification—or subclassification, if it be so considered—made by the Act as to bottlers and retailers of soft drinks is founded upon a reasonable difference or distinction.

In our discussion of the questions raised in subdivision (d), we pointed to the nature of the business of retailers of soft drinks. It was seen that the syrups handled by such retailers are bought and kept in bulk, the tax being laid upon them in mass per gallon. The syrups are required to be kept in certain containers prescribed by the Tax Commission, the tax to be paid upon the contents, and the payment to be evidenced by stamps affixed to the containers. It was concluded that such a method of collecting the tax in such a business, where operators of soda fountains manufacture the syrups into drinks and sell them in glasses, is a reasonable one, and is a regulation peculiarly fitted to the manner of conduct of the business. It is evident that to impose a tax upon each drink manufactured and sold over the counter, leaving it to the dealer to collect the same and pay it to the Tax Commission, would result in great measure in failure to collect the tax, and would operate in favor of the dishonest dealer by rendering easy evasion of payment.

The case of bottlers is clearly different. Their products, manufactured from syrups, are placed in sealed bottles and in this form sold and distributed, the tax being laid upon each bottled drink. Before placing these drinks upon the

market, the bottles are required, under the provisions of the Act, to affix to each bottle a license tax stamp, or to place upon it a license tax crown purchased under regulations promulgated by the Tax Commission, the stamp or crown being evidence of the payment of the tax. It is seen at a glance that this method of collecting the tax is properly imployed in the case of bottlers, being peculiarly adapted to the manner of conduct of that business, while it would be impracticable and unsuitable in the case of retailers of soft drinks. Hence it is clear that there is such a distinction or difference between the conduct of the business of bottlers and that of retailers of soft drinks as furnishes a reasonable basis for classification, and we think that the classification made is based upon a reasonable ground of difference bearing a natural relation to the business or occupation, and is in no sense arbitrary. It follows that the provisions of the Act under consideration, instead of being discriminatory as against the retailers of soft drinks, as contended by the petitioners, prescribe natural and appropriate regulations for the businesses to which they respectively apply.

With respect to the objection made by clause (6), much that we have said relative to classification applies. The distinction complained of is so obviously based upon reasonable grounds of difference inherent in or naturally connected with the respective occupations as to require no comment.

As to theater owners affected by admissions tax, the contention is made, under subdivision (f), that such owners are deprived of their property and of their liberty to contract by the requirements imposed as to the use of tickets. In support of this contention, the following provisions of the Act are pointed out: (1) The requirement that all exhibitors use tickets, either those furnished by the commission, or others not so furnished, which must be stamped, tickets in all cases being now required; and (2) the requirement that tickets be torn and one-half given to the patron.

It is argued that some theater owners may desire to use tickets only at certain times, while others may not wish to use them at all, and that to deny such owners the power to contract, specially or orally, with their patrons, is to deprive them of a constitutional right. The requirement that the admission price be printed on the ticket, and that no ticket be sold at other than the printed price, is objected to upon the ground that theater owners have a right to sell tickets to their patrons at any price they see fit. It is further argued that the requirement for tearing the ticket and giving one-half to the patron is an unauthorized interference with the rights of exhibitors, as an unconstitutional attempt to regulate their business. It is also urged that the patron himself may not wish to have his ticket torn, and that this requirement makes it necessary for the operator to incur additional expense through the employment of a ticket taker to handle the tickets in the manner prescribed by the Act.

Much of what we have said in our discussion of subdivisions (d) and (e) applies in this connection. The question here presented is again whether the regulations prescribed for the collection of the tax are reasonable. We do not think that they can be seriously challenged. The Act requires the Tax Commission to furnish, without cost to theater owners tickets which they may, but are not compelled to, use, as they are allowed to use tickets of their own choosing. Stamps are not required to be affixed to tickets furnished by the Commission, but only to tickets otherwise procured by exhibitors.

We do not regard the requirement that the admission price be printed on the ticket, and that the ticket shall be sold at no other price, or the requirement that the ticket be torn and part of it given to the patron, or the requirement that, when the owner or exhibitor uses tickets other than those furnished by the Tax Commission, which shall be stamped, the stamp shall be torn when the ticket is torn, as being either oppressive or unreasonable. It seems to us that the

burdens of the regulations are greatly exaggerated in the minds of the petitioners. We think that the regulations are reasonable and peculiarly fitted to the business to which they are intended to apply, and that they are calculated to protect the State and honest exhibitors against fraudulent evasion of the tax. Unless the exhibitor or theater owner takes the position that he should not be taxed at all, he can hardly object, in the light of reason, to the regulations imposed. The provisions of the Act here complained of are clearly not violation of any constitutional right of the petitioners.

Under subdivision (g), it is contended that the Act requires operators or owners of theaters using tickets other than those furnished by the Tax Commission to pay a double tax, and is, therefore, discriminatory and oppressive. In support of this contention it is pointed out that the Act first requires that such tickets be stamped with stamps "purchased from the South Carolina Tax Commission," and that in a subsequent provision it provides that the license tax shall be "due and payable monthly between the 1st and 10th day of each month," and requires the person liable for the tax to make the Tax Commission, at such time, a true and correct return, "showing the number and prices of admissions during the previous month, and remit the tax therewith." These provisions of the Act, it is contended, require the payment of the tax, first when the stamps are purchased, and again when the return is made between the 1st and 10th of each month.

It is sometimes said that the double taxation held to be invalid is generally confined to property tax; but, regardless of the Legislature's *authority* to impose a double tax, the presumption is always against its *intention* to do so, and the Courts will not construe a statute as imposing a double tax, unless such intention is clear from its terms or by necessary implication. In Cooley on Taxation (4th Ed.), at page 485, it is said:

"A statute will not be construed as imposing double taxation, if any other reasonable construction can be placed on it. Such a construction is not warranted, unless it is required by the express words of the statute or by necessary implication. Where it is once decided that any kind or class of property is liable to be taxed under one provision of the statute, it has been held to follow, as a legal conclusion, that the Legislature could not have intended that the same property should be subject to another tax, though there may be general words in the law which would seem to imply that it may be taxed a second time. This is a sound and very just rule of construction, and it has been applied in many cases where, at first reading of the law, a double taxation might seem to have been intended."

In 27 Am. & Eng. Ency. of Law, at page 608, we find:

"The Courts always frown upon double taxation, and even in those jurisdictions where the Legislature is held to have power to impose it, such a construction will be given to the statutes as to avoid double taxes if possible. A purpose to impose double taxes will not be presumed, and to produce such effect the legislative intent must be clear and unmistakable."

In *Newport v. Fitzer,* 131 Ky., 544; 115 S. W., 742; 21 L. R. A. (N. S.), 279, the Court said:

"And even where double taxation may not be violative of the Constitution, the Courts will never presume that double taxation was intended, nor will they so construe a legislative enactment as to enforce double taxation, unless its language is such as to leave no doubt that it was intended."

In *Bell v. Watson,* 3 Lea (Tenn.), 328, it is stated:

"Whatever power the Legislature may have to levy double taxes, the presumption always is against such an intent. A statute will not be construed so as to impose duplicate taxation, unless the construction is required by its express words or necessary implication. * * * The safe and sound rule of construction of revenue laws is to hold, in the absence

of express words plainly disclosing a different intent, that they were not intended to subject the same property to be twice charged for the same tax, nor the same business to be twice taxed for the exercise of the same privilege."

In *East Livermore v. Livermore Falls Trust & Banking Co.,* 103 Me., 418; 69 A., 306; 15 L. R. A. (N. S.), 952; 13 Ann. Cas., 631, the Court declared:

"It is elementary that no tax can be imposed without express statutory authority, that such authority is to be construed strictly against the State, and particularly that no double tax burden shall be imposed on any person or property, unless the statutes so clearly require it that no other construction is possible in reason. 'The intent to impose taxation which is double, even from an economic point of view is not to be ascribed to the Legislature, in the absence of clear and unambiguous expression.' * * * 'Tax laws should be so construed as to avoid double taxation, unless a contrary construction is compelled by express provision or necessary implication of the statute.' "

"Double taxation is * * * never to be presumed. Justice requires that the burdens of government, shall as far as is practicable, be laid equally on all, and, if property is taxed once in one way, it would ordinarily be wrong to tax it again in another way, when the burden of both taxes falls on the same person. Sometimes tax laws have that effect; but, if they do, it is because the Legislature has unmistakably so enacted. All presumptions are against such an imposition." *Tennessee v. Witworth,* 117 U. S., 129; 6 S. Ct., 645; 29 L. Ed., 830.

See, also, *Georgia Railway Co. v. Wright,* 125 Ga., 589; 54 S. E., 52. *State v. Graybeal,* 60 W. Va., 357; 55 S. E., 398. *Board of Revenue v. Montgomery Gaslight Co.,* 64 Ala., 269. *State v. Murphy,* 90 Conn., 662; 98 A., 343. *New York Cent. R. Co. v. Stevenson,* 277 Ill., 474; 115 N. E., 633. *Greene v. E. H. Taylor, Jr., & Sons,* 184 Ky., 739; 212 S. W., 925. *Board of County Com'rs Rice Co. v. Citi-*

zens' *Nat. Bank of Faribault,* 23 Minn., 280. *State v. Sim-mons,* 70 Miss., 485; 12 So., 477. *State ex rel. Pearson v. Louisiana & M. R. R. Co.,* 196 Mo., 523; 94 S. W., 279. *Nashua Sav. Bank v. Nashua,* 46 N. H., 389. *Old Dominion Copper Mining & Smelting Co. v. State Board of Taxes & Assessments,* 91 N. J. Law, 173; 103 A., 79. *Matter of Barbour's Estate,* 185 App. Div., 445; 173 N. Y. S., 276. *Commonwealth v. Fall Brook Coal Co.,* 156 Pa., 488; 26 A., 1071. *Providence Inst. for Savings v. Gardiner,* 4 R. I., 484. *Gulf Refining Co. of Louisiana v. City of Chattanooga,* 136 Tenn., 505; 190 S. W., 463. *Tennessee v. Whitworth,* 117 U. S., 129; 6 S. Ct., 645; 29 L. Ed., 830. *Amesbury, Woolen & Cotton Mfg. Co. v. Amesbury,* 17 Mass., 461. *Lewiston Water & Power Co. v. Asotin County,* 24 Wash., 371; 64 P., 554. *First Nat. Bank of City of Superior v. Douglas County,* 124 Wis., 15; 102 N. W., 315; 4 Ann. Cas., 34.

That part of the Act in question which relates to admissions tax imposes at the outset upon all paid admissions to places of amusement within the State a license tax of 1 cent for each 10 cents or fractional part thereof, and no other additional tax is specifically laid. The general scheme for collection of the tax, as we see it, was that tickets should be furnished to exhibitors, without cost, by the Tax Commission, under regulations prescribed as to the manner of their use, a true and correct return to be made by operators to the commission between the 1st and 10th of each month, showing the number and prices of admissions for the previous month, with payment of the tax at such time. With this main plan in mind, the Legislature, however, inserted in the Act a proviso giving to operators the option to use tickets other than those furnished by the tax commission, but in such case the operator was required to affix to each ticket a license tax stamp purchased from the Tax Commission, as evidence of payment of the tax.

As that part of the Act relating to the making of returns and payment of the tax between the 1st and 10th of each month follows that part relating to the purchase and afixing of stamps to tickets other than those furnished by the Tax Commission, it might appear, from a reading of these two provsions only, that those operators using tickets other than those furnished by the Commission would be required to pay the tax twice, first by purchase of stamps, and second at the time of making the return. But, reverting to the provision fixing the amount of the tax at 1 cent for each admission of 10 cents or fractional part thereof, we are brought fact to face with this situation: That if the tax is paid twice, the total amount paid will be 2 cents on each admission of 10 cents or ·fractional part thereof, which latter amount unquestionably has not been levied and would not be authorized under the law. It is highly improbable that the Legislature, in a provision of the Act relating to collection of the tax, would attempt to levy on certain individuals of a named class an additional tax equal in amount to that which it had previously laid in direct and certain terms on all members of the same class, thus subjecting these certain individuals to a duplicate tax. It is much more consonant with reason that, in determining the tax to be collected, the parts of the Act regulating the collection of the tax should be subordinate to that part which in unmistakable terms levies and fixes the amount of the tax. Taking the provision levying the tax, the provisions relative to tickets, and the provision relative to returns and payment of the tax together, and construing them in the light of the main scheme for collecting the tax, and in the light of the presumption against legislative intention to levy double taxation, we are of the opinion, and so hold, that it was not the intention of the Legislature to impose a double tax upon operators using tickest other than those furnished by the Tax Commission, and that no operator who has paid the

tax once, in compliance with the provisions of the Act, can be required to pay the same tax again.

III. Under the last general proposition, the petitioners argue that the Act is unconstitutional, because it is vague, indefinite, and uncertain in its terms. In support of this contention, they refer to certain specific provisions of the Act, to which we shall presently advert. In 25 R. C. L., at page 810, we find:

"Where an Act of the Legislature is so vague, indefinite, and uncertain that the Courts are unable to determine, with any reasonable degree of certainty, what the Legislature intended, or is so incomplete, or is so conflicting and inconsistent in its provisions, that it cannot be executed, it will be declared to be inoperative and void. But legislation should not be held invalid on the ground of uncertainty, if susceptible of any reasonable construction that will support and give it effect. An Act will not be declared inoperative and ineffectual on the ground that it furnishes no adequate means to secure the purpose for which it is passed, if men of common sense and reason can devise and provide the means, and all the instrumentalities necessary for its execution are within the reach of those intrusted therewith. The fact, alone, that an Act is open to the criticism that it is vague, uncertain, and indefinite in some of its provisions does not render it void, so long as it does not infringe some constitutional provision and is capable of execution in its more essential provisions."

In 26 Am. & Eng. Ency. of Law, p. 656. it is said:

"When the language of an Act appears on its face to have a meaning, but it is impossible to give it any precise of intelligible application in the circumstances under which it was intended to operate, it is simply void; for, if no judicial certainty can be settled upon as to its meaning, Courts are not at liberty to supply the deficiency, or make the statute certain. But legislation cannot be nullified on the ground of uncertainty, if susceptible of any reasonable construction that will support it."

See *Detroit v. Rush,* 82 Mich., 532; 46 N. W., 951; 10 L. R. A., 171.

Certain provisions of Section 14 of the Act, which petitioners point to as being conclusive of their contention, are as follows:

"It shall be provided by regulations of the Tax Commission, the methods of breaking packages, forms and kinds of containers, and methods of affixing stamps, that shall be employed by individuals, firms or corporations subject to the tax imposed by this Act, which will make possible enforcement of payment by inspection; and any individual, firm or corporation subject to this tax, engaging in or permitting such practices as are prohibited by regulations of the Tax Commission, or in any other practice which make it difficult to enforce the provisions of this Act by inspection, shall be deemed guilty of a misdemeanor.  *  *  *"

It is suggested that these provisions render the Act invalid for uncertainty, for the reason that it is impossible to tell what "regulations" may be prescribed by the Tax Commission. We do not think this contention can be seriously maintained. In the case of *Santee Mills v. Query,* 122 S. C., 158; 115 S. E., 202, the Court said:

"The State Tax Commission has no power delegated to make any rules or regulations inconsistent with the law enacted or for any other purpose than to carry out the legislative will expressed in statutory form. It is elementary that, while the Legislature may not delegate its power to make laws, it may vest in administrative officers and bodies a large measure of discretionary authority, especially to make rules and regulations relating to the enforcement of the law. 12 C. J., 844–853. *Port Royal Min. Co. v. Hagood,* 30 S. C., 519; 9 S. E., 686; 3 L. R. A., 841. *Michigan Cent. R. Co. v. Powers,* 201 U. S., 245; 26 S. Ct., 459; 50 L. Ed., 744. *Leser v. Lowenstein,* 129 Md., 244; 98 A., 712."

It will be noted that the petitioners are not objecting to any regulations already promulgated by the Tax Commis-

sion, but only to regulations that may be prescribed in the future, or, in other words, to the authority here bestowed on the Commission to prescribe such regulations. The Commission may lawfully promulgate only such regulations as are consistent with the terms of the Act and as will carry out the legislative will and intent; the presumption is that the Commission will not attempt to go beyond its authority and that only such regulations will be prescribed. This presumption remains until the contrary is shown.

Some difficulty, however, is presented by the provision that:

"Any individual, firm or corporation subject to this tax, engaging  *  *  *  in any other practice which make it difficult to enforce the provisions of this Act by inspection, shall be deemed guilty of a misdemeanor."

The petitioners urge that this provision necessarily renders the Act invalid, as it is impossible to know what "practice" might make it "difficult" to enforce the Act by inspection. The provision is penal in its nature. The general rule, as to the required definiteness of a penal statute, is thus stated by Mr. Justice Brewer in *Chicago & N. W. R. Co. v. Dey* (C. C.), 35 F., 866; 1 L. R. A., 744:

"No penal law can be sustained unless its mandates are so clearly expressed that any ordinary person can determine in advance what he may and what he may not do under it."

It would be highly desirable if every penal statute should contain, in *totidem verbis,* a detailed description of the Act or Acts penalized; but such ideal condition is hardly possible of attainment, for the reason that it is not practicable to define in every statute all controlling words. To attempt to do so would frequently result in statutes of unwarranted length, and confusion in the administration of the law. We think that the rule should be reasonably applied, in the light of the object sought to be attained and the nature of the subject-matter of the statute.

The purpose of the Act is, as indicated, to raise revenue for the support of the State government. The tax imposed is an excise tax, and provision is properly made, as we have already shown, for the promulgation by the Tax Commission of regulations for the enforcement of its payment by inspection. As means of enforcing the authorized regulations, the Act makes it a misdemeanor for any one subject to the tax to engage in or permit practices prohibited by the regulations, or to engage in "any other practice" which will make it "difficult" to enforce the Act by "inspection."

To "inspect" means to investigate, to examine, to look into. "Inspection," as used in the statute, could mean nothing other than investigation or examination, for the purpose of determining whether the statute is being violated or obeyed by those subject to the tax. "Practice" in this connection means action, something done or performed. The question, as we see it, is principally with reference to the application of the word "difficult," which has a well-accepted meaning, to a "practice" affecting "inspection"— whether that word in this connection clearly fixes a standard or measure of the offense created by the statute. Taking into consideration the purpose and subject-matter of the Act, and the other provisions of the paragraph in which the present misdemeanor is created, we think that the offense is measured, by the language used, with sufficient accuracy to enable it to be understood by any person of ordinary intelligence engaged in an occupation or a business to which the provision under consideration is applicable. We may add that the word "difficult," in the present connection, seems to us much more definite and fixed in meaning as a measure of conduct than many pivotal words in penal statutes commonly enforced. We do not think that the Act, or this portion of it, should be declared invalid for uncertainty.

While we have found no case in which the Court has construed the exact language under consideration, there are numerous cases in which somewhat similar provisions have

been passed upon and held not to invalidate, for uncertainty, the Acts of which they formed part. It may be enlightening to refer to a few of these cases.

In the case of *Richardson v. Simpson,* 88 Kan., 684; 129 P., 1128; 33 L. R. A. (N. S.), 911, it was held that an Act authorizing the revocation of a license of a dentist for specific offenses named in the law, was not void for indefiniteness because of the additional phrase, "or for any other dishonorable conduct"; the Court observing that "the expression, 'other dishonorable conduct,' may be interpreted to mean conduct of the same general character as that already specified."

In *Alcorn Cotton Oil Co. v. State,* 100 Miss., 299; 56 So., 397; 40 L. R. A. (N. S.), 875, we find (quoting syllabus):

"A statute imposing a penalty for selling adulterated cotton seed meal without noting the adulteration on the package is not unconstitutional, in failing to inform an accused of the nature and cause of the accusation against him, because it does not fix any standard of adulteration."

In *Ex parte Daniels,* 183 Cal., 636; 192 P., 442; 21 A. L. R. 1172, the Court held that the provision of a statute "making it unlawful to travel at an unreasonable or unsafe speed, and punishing the violation of such law as a crime, is valid and constitutional legislation, although there are cases holding to the contrary."

In *Katzman v. Commonwealth of Kentucky,* 140 Ky., 124; 130 S. W., 990; 30 L. R. A. (N. S.), 519; 140 Am. St. Rep., 359, we find (quoting syllabus):

"A statute forbidding druggists to sell poisons at retail, except under certain conditions, one of which is that they shall satisfy themselves that they are to be used for legitimate purposes, is not invalid for not defining the meaning of the words 'retail' and 'legitimate purposes.' "

In the case of *Sears, Roebuck & Co. v. Federal Trade Commission* (C. C. A.), 258 F.,307; 6 A. L. R., 358, a

statute forbidding "unfair methods of competition" was held to be constitutional. The Court said:

"But the phrase is no more indefinite than 'due process of law.' The general idea of that phrase, as it appears in Constitutions and statutes, is quite well known; but we have never encountered what purported to be an all-embracing schedule, or found a specific definition that would bar the continuing processes of judicial inclusion and exclusion based upon accumulating experience. If the expression, 'unfair methods of competition,' is too uncertain for use, then under the same condemnation would fall the innumerable statutes which predicate rights and prohibitions upon 'unsound mind,' 'undue influence,' 'unfaithfulness,' 'unfair use,' 'unfit for cultivation,' 'unreasonable rate,' 'unjust discrimination,' and the like. This statute is remedial and orders to desist are civil; but even in criminal law convictions are upheld on statutory prohibitions of 'rebates or concessions,' or of 'schemes to defraud,' without any schedule of acts or specific definition of forbidden conduct, thus leaving the Courts free to condemn new and ingenious ways that were unknown when the statutes were enacted Why? Because the general ideas of 'dishonesty' and 'fraud' are so well, widely, and uniformly understood that the general terms, 'rebates or concessions,' and 'schemes to defraud,' are sufficiently accurate measures of conduct."

We shall next notice the contention of the petitioners as to the alternative provisions of the Act. Section 21 provides:

"That if any clause, sentence, paragraph or part of the foregoing sections of this Act relating to the license tax for the privilege of selling soft drinks shall, for any reason, be adjudged by any Court of competent jurisdiction, to be invalid and thereby stay the collection of tax on soft drinks as heretofore provided, then and in such event, the following sections shall apply; otherwise they shall be ineffective."

The alternative provisions (Section 22) which follow the foregoing Section (21) correspond to the provisions of the Act of 1927 imposing a soft drink tax. The present Act also provides by Section 36 that:

"Should this Act or any part of the same be declared unconstitutional or void for any reason by any Court of competent jurisdiction, then the appropriate provisions of Act No. 73, approved 22d day of April, 1927, applicable to the same subject-matter, shall be of full force and effect and unrepealed and uneffected by the terms of this Act."

It is argued that by these provisions, especially that one intended to give alternative force to "appropriate" provisions of the 1927 Act (35 St. at Large, p. 121), the present Act is made uncertain, and for that reason is unconstitutional. We think this contention is without merit. In *Barringer v. City Council of Florence,* 41 S. C., 501; 19 S. E., 745, we find (quoting syllabus):

"The Dispensary Act of 1812 [21 St. at Large, p. 62] having been adjudged unconstitutional, except in so far as it prohibits the granting of licenses, its repealing clause failed to repeal prior Acts providing a punishment for unlicensed sales; and hence one selling liquor may be indicted under such prior laws of the State, and may also be punished under an ordinance of the city, where sold, prohibiting such sale."

In 25 R. C. L., at page 913, it is said:

"Where a repeal of a prior law is inserted in an Act in order to secure the unobstructed operation of the Act, and the repealing law is itself held to be void, the provisions for the repeal of the prior law will fall with it, and will not be operative in the repeal of the prior law, unless the language of the repealing clause is such as to leave no doubt as to its intention to repeal a former law, in any event."

See, also, 36 Cyc., p. 1098.

The present Act is declared by its title to be amendatory to the Act of 1927, both Acts relating to the same subject-matter. If the present Act is unconstitutional, then it did

not repeal the Act of 1927, in whole or in part. Such result is clearly consistent with the intent of the Legislature, as evidenced by Section 36 of the 1928 Act. If that Act is held to be unconstitutional and invalid, then, and only then, the "appropriate" provisions, if any, of the Act of 1927, applicable to the same subject-matter, including the alternative provisions of the 1927 Act found in Section 22 of the 1928 Act, would be of full force and effect and unrepealed. The scheme of the alternative provisions is clear, the language used is intelligible, and we find no uncertainty or vagueness as complained of.

We have gone fully into all the questions raised by the pleadings. We have also carefully considered the argument of counsel for the petitioners, and, while we admire the laudable zeal with which he has prosecuted the action, we find ourselves unable to agree with his contentions.

The Court appreciates the earnest plea that ever person is entitled to the enjoyment of life, liberty, and property, and to the equal protection of the laws guaranteed by the Federal and State Constitutions, and will protect and safeguard these fundamental rights to the extent, if necessary, of declaring invalid any legislative enactment clearly shown to be in violation of them. But we have been unable to discover, after most careful consideration, that the Act in question deprives the petitioners of any such rights.

It is, therefore, the judgment of the Court that, in each of the cases, the injunction prayed for be denied and the petition dismissed. And it is so ordered.

Mr. Chief Justice Watts, and Messrs. Justices Blease and Carter concur.

Mr. Justice Cothran dissents.

Mr. Justice Blease (concurring) : As I understand the dissenting opinion of Mr. Justice Cothran, he is in full accord with all the holdings in the opinion of Mr. Justice Stabler except one, to wit, the holding which approves the "enrolled Bill rule," as laid down in the case of *State*

*ex rel. Hoover v. Chester,* 39 S. C., 307; 17 S. E., 752. If the view of Mr. Justice Cothran should prevail in this case, it would mean that the holding in the *Hoover case* would be overruled, and the "journal entry rule" would govern hereafter. The last-mentioned rule was announced in the case of *State v. Platt,* 2 S. C., 150; 16 Am. Rep., 647. Of it, our great jurist, Hon. Henry McIver, said this:

"I think, however, that the case of *State v. Platt* cannot be sustained, either upon principle or authority, but that, on the contrary, it is opposed to the decided weight of authority, and establishes a rule which may, in some cases, produce disastrous results, and that it should be overruled." *State v. Hagood,* 13 S. C., 60.

I am in favor of adhering to the principle declared in the *Hoover case,* decided unanimously in 1893 by Justices McIver, McGowan, and Pope. To change the rule there stated would, as I conceive it, at this time more than ever before, "produce disastrous results." In brief, some of the reasons for my opinion are these: (1) The Court should hesitate long before upsetting a rule of law recognized continuously for 35 years; (2) the "enrolled Bill rule" is as fair, and to me seems fairer, that the "journal entry rule"; and (3) this Court should at all times be disposed to accept, if possible, within the constitutional limitations, without the least question, the property certified Acts of the General Assembly, a co-ordinate branch of our State government, and a branch of our government as high in its authority as this Court is higher in the power possessed by it.

MR. JUSTICE CARTER concurs.

MR. JUSTICE COTHRAN (dissenting): I am painfully aware of the disastrous consequences, serious losses to the revenues of the State and much confusion, which would result from the adoption of the view entertained by me as to the constitutionality of the Act in question; considerations which should have no weight, but inevitably do, in the decisions of the issue involved. It is distressing to know that,

in my view, the disaster has been due to a legislative disregard of the mandate of the Constitution, a matter which may seriously affect other legislation than that involved here, if the disregard should be condoned by reason of the consequences of a judicial declaration otherwise.

The only point in this case that I propose to discuss is the alleged unconstitutionality of the Act in question, by reason of its violation of Article 3, § 15, of the Constitution of 1895. That section reads:

*"Bills for raising revenue shall originate in the House of Representatives,* but may be altered, amended or rejected by the Senate; all other Bills may originate in either House, and may be amended, altered or rejected by the other."

The rationale of the provision appears to be traceable to the ancient distrust which the House of Commons entertained of the House of Lords, a safeguard, as it was conceived, against the usurpations and extravagance of the upper House, a consideration which hardly obtains in a government in which the one is as thoroughly democratic (in a broad, not party, sense) as the other. The law, however, is so written, and in view of Article 1, § 29, of the Constitution: "The provisions of the Constitution *shall be taken, deemed and construed to be mandatory* and prohibitory, and not merely directory, except where expressly made directory or permissory by its own terms"—if the Act offends the quoted section, the judicial duty is to so declare, regardless of the financial loss or embarrassment to the fiscal affairs of the State which may ensue. The legislative history of the Act under review is as follows:

A Bill, known as House Bill No. 1082, and entitled "A Bill to repeal the State license tax for the privilege of selling cut glass, etched glass, art glass and sporting goods," was introduced in the House of Representatives and read on January 24, 27, and 31, 1928. The provisions of the Bill as passed by the House were *confined exclusively to repealing the license tax on the articles mentioned* in the title (to which was

added 22 calibre cartridges). The Bill as passed by the House was as follows:

"A Bill to repeal the State license tax for the privilege of selling cut glass, etched glass, art glass and sporting goods.

"Be it enacted by the General Assembly of the State of South Carolina:

"Section 1. That so much of the provisions of an Act entitled 'An Act to raise revenue for the support of the State Government,' approved April 22, 1927, imposing a tax for the privilege of purchasing, selling or distributing within this State, cut glass, art glass, and sporting goods, twenty-two (22) calibre cartridges be, and is hereby, repealed.

"Section 2. This Act shall take effect January 31, 1928."

Thereafter the Bill was sent to the Senate, where it was known as Senate Bill No. 1113, and where it passed two readings on February 1 and February 17, 1918. On February 21, 1928, the Senate amended the Bill, by adding to the body of the Bill substantially the provisions now found in the Act of the General Assembly approved March 10, 1928, in regard to the tax on soft drinks, except that the tax on syrups was fixed at 75 cents per gallon, and by adding the following words to the title:

"And to provide a license tax on soft drinks sold within the State of South Carolina and to provide for the collection of said license tax."

The Bill, thus amended, passed third reading in the Senate on February 22, 1928, and was returned to the House with amendments. Upon the return of the amended Bill to the House of Representatives, that body on February 24, 1928, refused to agree to the amendments by the Senate. Thereupon the Bill was sent to the Committee on Free Conference, which committee submitted its report on March 1, 1928, recommending the adoption of the Bill, as therein changed, by striking out all after the enacting words and inserting in lieu thereof substantially the Senate provision for the tax

on soft drinks and the other provisions of the present Act of the General Assembly, and recommending also a change in the title, so as to conform to the new scope and purpose of the Bill. The report of the Free Conference Committee was thereafter adopted by each House of the General Assembly on March 6, 1928.

The pencil memorandum appearing on the printed page of the Free Conference report, "See page 47 for title C. H. C.," was made by C. H. Gerald, a clerk in the engrossing department, page 47 containing the following recommendation as to the change of the title:

"Sec. 5. Amend the title so that the said title will read as follows:

"A Bill to amend an Act entitled 'An Act to raise revenue for support of the State government,' approved the twenty-second day April, 1927, so as to repeal the license tax on sporting goods, cut glass, etched glass, art glass, and twenty-two calibre cartridges, and to provide for a license tax on soft drinks, admissions, contractors, ammunition, candy, playing cards, manufactured tobacco products and chain stores and to levy a tax on documents, for support of the State government."

Thereafter the title of the Bill was changed, both in wording and in scope and purpose, in connection with the engrossing and enrollment of the Bill, so as to conform to the recommendation of the Free Conference report, and after having been ratified and engrossed, and with such new title, was presented and approved by the Governor on March 10, 1928, and filed as an Act in the office of the Secretary of State.

The contention of the petitioners is that the Bill which is claimed to have been passed as an Act was one for raising revenue, and did not originate in the House of Representatives, as required by Section 15, Article 3, of the Constitution.

It will hardly be contended that the Bill as originally introduced in the House, was *a Bill to raise revenue;* its title was, "A Bill *to repeal* the State license tax for the privilege of selling cut glass, etched glass, art glass, and sporting goods"—decidedly *a contraction* of the revenue than otherwise; certainly no revenue was contemplated to be *raised* by it. It was such a Bill as might have been introduced in either House.

I think that it is equally clear that the Bill which was, upon the adoption by both Houses of the Free Conference report as an Act, enrolled, ratified, approved by the Governor, and filed with the Secretary of State, was one to raise revenue. The question is: Can it be considered as having originated in the House of Representatives, as required by the Constitution?

Going back a step: The Senate amended the House Bill, by adding provisions for a license tax on soft drinks, substantially as in the Act under consideration, and amended the title by adding:

"And to provide *a license tax* on soft drinks sold within the State of South Carolina and to provide for the collection *of said tax.*"

These amendments were rejected by the House; but, if they had been accepted (or, in legislative parlance, had been concurred in) by the House, it seems to me clear that the amendments, amounting to a Bill for raising revenue, must have been invalid as not having originated in the House.

The Free Conference report was upon its face styled "Revenue Measure," and the original Bill was, by the adoption of the Free Conference report, amended as to its title and body, by adding an entirely new and complete system of revenue-producing provisions, a subject not touched upon in the House Bill which it purported to amend.

It is sought to sustain the Act upon the principle that no inquiry can go behind the enrollment, ratification, approval, and filing of an Act, to determine whether in the passage of

an Act the requirements of the Constitution have been complied with, *unless the requirement is one that, under the Constitution, must be entered upon the journal.*

I do not think that such is the law. In my opinion it would present a most anomalous situation, that the Legislature, in the passage of an Act, could ignore the mandatory requirements of the Constitution and slip into the bombproof of enrollment, ratification, approval, and filing of the Act against all inquiry as to the constitutional regularity of their proceedings; this, I think, regardless of the inquiry whether or not, under the Constitution, the fact of compliance with such requirement must be entered in the journal. To hold otherwise would appear to me to set the action of the Legislature above the mandatory requirements of the Constitution, and permit it, *by its action,* to override that organic law.

The contention, in a measure, is sustained by the case of *State ex rel. Hoover v. Chester,* 39 S. C., 307; 17 S. E., 752, particularly by the following extract from the opinion in that case:

"We announce that the true rule is that, when an Act has been duly signed by the presiding officers of the General Assembly, in open session in the Senate-House, approved by the Governor of the State, and duly deposited in the office of the Secretary of State, it is sufficient evidence, nothing to the contrary appearing upon its face, that it passed the General Assembly, and that it is not competent either by the journals of the two Houses, or either of them, or by any other evidence, to impeach such an Act. And, this being so, it follows that the Court is not at liberty to inquire into what the journals of the two Houses may show as to the successive steps which may have been taken in the passage of the original Bill. *It will be observed that this conclusion by no means negatives [denies?] the power of the Court to inquire into those prerequisites fixed by the Constitution, and of which prerequisites the journals of the two Houses*

*are required to furnish the evidence.* Such, for instance, as the organization of the two Houses, the presence of a quorum, the votes of two-thirds of the members by ayes and noes to be entered on the journals in certain cases."

In other words, no matter how flagrantly the Constitution may have been disregarded in the passage of an Act, the violation is covered up by the ratification, as carpenter's putty, like charity, "covers a multitude of sins," unless by the Constitution the journal is required to furnish the evidence of compliance.

The cases of *State ex rel. Hoover v. Chester,* 39 S. C., 307; 17 S. E., 752; *McCullough v. Brown,* 41 S. C., 220; 19 S. E., 458; 23 L. R. A., 410; and *State ex rel. George v. Aiken,* 42 S. C., 222; 20 S. E., 221; 26 L. R. A., 345, were decided during a period of the most intense political excitement, involving the establishment of the State Dispensary. The case first mentioned is entirely inconsistent with the *McCullough case,* which, in turn, was overruled by the *George case.* Not one of the three establishes an abiding faith in the conclusions reached.

The legislative story of the State Dispensary Law is that a straight prohibition Bill passed the House and was amended in the Senate by the incorporation of the State Dispensary system. In the *Hoover case* the point was made that the Dispensary Law was a revenue measure, which did not originate in the House. The Court held that it was not a revenue measure, but one to regulate the sale of liquor, within the police power of the State, and paid scant attention—in fact, none at all—to the constitutional question raised, but discussed the case upon this ground:

"But it is contended by the relators that, notwithstanding this due regularity of the enrolled Act, yet *that the journals the entries of amendments on the original Bill."*
*of the two Houses fail to correspond in every particular with*

That was the sole question discussed, and as to it I do not think that any one has ever questioned the law that such dis-

crepancies are concluded by the enrolled Act—a very different question than that of the unconstitutionality of the Act by reason of the violation of mandatory requirements. I think, therefore, that the observation of Mr. Justice Pope that the enrollment is conclusive of constitutional objections, unless the requirements must under the Constitution be set forth in the journal, is clearly *obiter dictum*, and not binding upon this Court.

In the *McCullough case*, it was distinctly held that the Dispensary Law was a revenue measure, and not a prohibition law, or a law regulating the sale of liquor under the police power. If that holding be correct, and it was so decided by the same Court that decided the *Hoover case*, which had held that it was not a revenue measure, the point made in the *Hoover case* that it had not originated in the House should have been sustained.

The *George case* then came on, the personnel of the Court having slightly changed, the *McCullough case* was overruled, and the dispensary system, which had received a check under the *McCullough case* "now trebly thundering swelled the gale."

In the case of *State v. Hagood*, which was later overruled in the *Hoover case*, the journals of both Houses showed that the Bill as it passed both Houses provided for a general levy of $4\frac{1}{2}$ mills, and that, as enrolled, ratified, and approved by the Governor, it provided for a general levy of $4\frac{3}{4}$ mills, the difference, of one-fourth mill, being an appropriation of $3,000.00 for the Charleston militia, which in some way became a part of the Bill after it had passed both Houses without it. How it came to be inserted, whether in a free conference report or otherwise, does not appear. The Act was attacked upon the constitutional ground that, as passed, it had not received three readings in each House as required by the Constitution of 1868, which it may be observed, in passing, does not contain the mandatory provision in that of 1895. A majority of the Court, Chief Justice Willard

and Associate Justice McGowan, held that, in determining the issue of constitutionality, resort might be had to the journals of the two Houses, upon the authority of the case of *State v. Platt,* 2 S. C., 150; 16 Am. Rep., 647. Associate Justice McIver (later Chief Justice) concurred in the result, considering himself bound by the *Platt case* as long as it stood unoverruled. He, however, turned the force of his powerful artillery upon the conclusions announced in the *Platt case,* with no immediate effect, but with the result that later, in the *Hoover case,* the *Platt case* was overruled. I do not think that there is any doubt but that the opinion of that great Judge had all to do with the decision in the *Hoover case* and the overruling of the decision in the *Platt case.* With great deference and diffidence, I venture to say that the opinion of Justice McIver in the *Hagood case* contains two fundamental errors: (1) He applied the same rule to constitutional objections as to objections based upon matters of routine legislative proceedings. (2) His conception that even constitutional objections were concluded by the enrollment, ratification, and approval, unless the Constitution specifically required the entry of the matter complained of in the journal.

There can be no doubt that matters of routine legislative proceedings, not at all referred to in the Constitution, but regulated by rule or custom, are concluded by the enrollment, ratification, and approval of an Act; but constitutional requirements are not. This much I think is conceded in the opinion, as the following extract shows:

"The true rule, in my judgment, is that, when an Act has been enrolled, has had the great seal of the State affixed to it, has been signed by the president of the Senate and Speaker of the House of Representatives, and has been approved by the Governor, it imports absolute verity; that its terms can only be finally ascertained by an inspection of the enrolled Act, and that it is not competent to go behind it, and alter its terms, either by entries in the journal of the

two Houses or any other evidence. Its constitutionality may, of course, be inquired into, both for the purpose of determining whether any of its admitted provisions are in conflict with the Constitution, either State or Federal, and also for the purpose of determining whether the journals show what the Constitution requires they shall show in regard to Acts for certain purposes; for instance, where an Act purports to authorize the contracting of a public debt, whether the Act was passed by a two-thirds vote taken by yeas and nays, because, by the express terms of the Constitution, no such law can take effect until it has been passed by such a vote, which is required 'to be recorded by yeas and nays, on the journals of each House.' "

The vice in this statement, as I see it, is to limit the inquiry as to constitutional requirements to those which the Constitution requires shall be specifically entered in the journal. In the illustration used, the contracting of a public debt, where by the express terms of the Constitution such a law cannot take effect until it has been passed by a two-thirds vote by yeas and nays, which is required to be recorded by yeas and nays on the journals of each House, there can be doubt but that the journal may be resorted to upon the inquiry of compliance with such requirement; but is that provision more mandatory than Article 3, § 18, "No Bill or Joint Resolution shall have the force of law until it shall have been read three times and on three several days in each House," etc.? And how is that to be determined, except by recourse to the journal, which, under Section 22, each House is required to keep of its own proceedings?

Certainly the first, second, and third readings of a Bill are parts, and most vital parts, of the proceedings of the two Houses; and by Section 22 they are required to be entered in the journals. Tested by the strict rule relied upon in the foregoing extract from the *Hagood case,* resort may be had to the journals to determine whether this mandatory requirement has been complied with. How else could this

essential element of the validity of an Act be determined? Certainly not by the presumption from the enrollment, ratification and approval of the Act.

Upon the principle contended for, a Bill which had never been introduced in either House, and had not had a single reading in either, might be enrolled, ratified, and approved, and all inquiry concerning the constitutional requirement concluded. In *Field v. Clark,* 143 U. S., 649; 12 S. Ct., 495; 36 L. Ed., 294, the constitutionality of an Act of Congress was questioned upon the ground that a certain provision which was in it upon its final passage was omitted when the Bill was signed by the presiding officers of the two Houses. The Court held that the Bill carried on its face a solemn assurance that it had been passed by Congress, and said :

"The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed Congress, all Bills authenticated in the manner stated, *leaving the Courts to determine, when the question properly arises, whether the Act, so authenticated, is in conformity with the Constitution."* (Italics added.)

In reference to the issue raised whether the Act was one to raise revenue, which could originate only in the House of Representatives, the Court held that the Act was one to provide a national currency secured by a pledge of United States bonds, and which *in furtherance of that object,* and also to meet expenses attending the execution of the Act, imposed a tax on the notes in circulation, was clearly not a revenue Bill; that revenue Bills are those which levy taxes, and are not Bills for other purposes which may incidentally create revenue; that the tax was a means of effectuating the great object of providing a currency based upon the honor of the government; that there was no purpose to raise revenue to be applied in meeting the expenses or obligations of the government. To the same effect are *Twin City Bank v.*

*Nebeker* 167 U. S., 196; 17 S. Ct., 766; 42 L. Ed., 134. *Millard v. Roberts,* 202 U. S., 429; 26 S. Ct., 674; 50 L. Ed., 1090. In a note to 35 L. R. A., 188, at page 190, it is said:

"An 'Act for raising revenue,' as contemplated by the constitutional clauses aforesaid, may, therefore, be defined thus, 'An Act for raising revenue (which must originate in the lower branch of the Legislature), is one which has the avowed purpose of increasing the funds for meeting the general governmental needs by a compulsory imposition and without giving any direct and immediate equivalent in return for the payment thereof.' "

There can scarcely be a doubt but that the House Bill No. 1082, "To repeal the State license tax for the privilege of selling cut glass, etched glass, art glass and sporting goods," might constitutionally have been introduced in the Senate as a Senate Bill, at the same time that it was introduced in the House, as is frequently done, to get the benefit of the speedier progress of either Bill; and the ground upon which it might have been so introduced is that it does not purport to be a Bill for raising revenue; in fact, its effect would be directly contrary to raising revenue. If it had been so introduced in the House, could the Senate have transformed it by amendment into a Bill not contracting, but raising, revenue? I do not think so.

In *State v. Wray,* 109 Mo., 594; 19 S. W., 86, it was held that the presumption from the enrollment is conclusive, except as to matters upon which the Constitution makes the validity of the enactment rest.

In *Hunt v. State,* 22 Tex. App., 396; 3 S. W., 233, it was held that, where the Constitution requires certain things to be done, the Court may look to the journals to see that they are done.

In *People v. Mahaney,* 13 Mich., 481; *Attorney General v. Joy,* 55 Mich., 94; 20 N. W., 806, and *Callaghan v. Chipman,* 59 Mich., 610; 26 N. W., 806, it was held that the

Court may take notice of the journals to determine whether or not constitutional requirements were complied with.

In *Smithee v. Garth*, 33 Ark., 17, it was held that, if it appears affirmatively on the journal that in the passage of any Bill some mandatory provision of the Constitution has not been complied with, it will be fatal to the validity of the statute.

In *Worthen v. Badgett*, 32 Ark., 496, it was held to be well settled that Courts will look to the legislative journals to ascertain whether or not the Act in fact passed in accordance with the forms and in the manner prescribed by the Constitution.

In *Glidewell v. Martin*, 51 Ark., 559; 11 S. W., 882, it was held that the enrolled Bill (Act?) supplies by presumption everything necessary to its validity, *save where the journals show affirmatively a violation of the Constitution.*

In *Weill v. Kenfield*, 54 Cal., 111, it was held that it is the duty of the Court to see that constitutional requirements in the passage of a Bill have been complied with.

In *Fowler v. Peirce*, 2 Cal., 165, it was held that the Court may go behind the Act to inquire whether or not the Legislature or the executive has violated or disregarded the mode pointed out by the organic law; that the power is incident to all Courts of general jurisdiction, and necessary to the protection of public rights and liberties.

In *McCulloch v. State*, 11 Ind., 424, it was held that the Act is a nullity, if the journals show that the constitutional requirements were not complied with.

In *People v. Burch*, 84 Mich., 408; 47 N. W., 765, it was held that the journals may be examined to ascertain whether or not the Act was constitutionally passed.

In 1 Cooley, Const. Lim. (8th Ed.), 277, it is said:

"Each House keeps a journal of its proceedings, which is a public record, and of which the Courts are at liberty to take judicial notice. If it should appear from these journals that any Act did not receive the requisite majority, or that in

respect to it the Legislature did not follow any requirement of the Constitution, *or that in any other respect the Act was not constitutionally adopted,* the Courts may act upon this evidence and adjudge the statute void."

In *Barber v. Hunt,* 100 Mo., 22; 13 S. W., 98; 8 L. R. A., 110; 18 Am. St. Rep., 530, it was held that *matters of detail* will be presumed properly performed, where journal records the doing of the main Act and is silent as to the subsidiary matters.

I think that the true rule is that merely negative evidence is not sufficient to impeach the enrolled Act, signed and authenticated by the proper officers and lodged in the office of the Secretary of State. Speaking of the constitutional provision as to three readings in each House, Judge Cooley says :

"The journals which each House keeps of its proceedings ought to show whether this rule is complied with or not: but, in case they do not, the passage in the manner provided by the Constitution must be presumed, in accordance with the general rule which presumes the proper discharge of official duty." Cooley, Const. Lim. (early edition), 167.

In *Andrews v. People,* 33 Colo., 193, 79 P., 1031; 108 Am. St. Rep., 76, the Court said :

"In determining whether the constitutional requirements with respect to the passage of Bills have been complied with, resort can be had to the legislative journals. If it affirmatively appears therefrom, either expressly or by necessary implication, that the provisions of the Constitution were not observed, then the Bill is not valid. If, however, they are merely silent on this question, it must be presumed that the fundamental law on the subject of the passage of Bills was in all respects followed."

In *McDonald v. State,* 80 Wis., 407; 50 N. W., 185, the Court said :

"The Courts will take judicial notice of the statute laws of the State, and to this end they will take like notice of the contents of the journals of the two Houses of the Legislature far enough to determine whether an Act, published as a law, was actually passed by the respective Houses in accordance with constitutional requirements."